# Illinois Official Reports

## Appellate Court

***Kovac v. Barron*, 2014 IL App (2d) 121100**

| | |
|---|---|
| Appellate Court Caption | F. GARY KOVAC, Plaintiff and Counterdefendant-Appellee and Cross-Appellant, v. SANDRA L. BARRON, Individually and as Independent Administrator of the Estate of Kenneth L. Barron, Jr., Deceased, Defendant and Cross-Defendant and Counterplaintiff-Appellant and Cross-Appellee (Repair Services, Inc., Defendant; Pinnacle Systems, Inc., Press Room Electronics, Inc., and Triad Controls, Inc., Defendants and Cross- Plaintiffs-Appellees and Cross-Appellants). |
| District & No. | Second District<br>Docket No. 2-12-1100 |
| Filed | March 7, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from a dispute between the shareholders of a group of businesses they operated over a period of several years during which plaintiff suffered the loss of a large amount of money through the fraudulent practices of defendant's deceased husband, the evidence supported the trial court's finding that defendant's husband was guilty of constructive fraud, especially in view of his payment of excessive compensation to himself and defendant; furthermore, a constructive trust was properly imposed as part of the judgment on the fraud count, the judgment entered for plaintiff on the count alleging misuse of corporate assets was not against the manifest weight of the evidence, the judgment on the breach of fiduciary duty count entered for plaintiff was reversed and reentered by the appellate court in favor of the corporate entities, and the award of punitive damages was not an abuse of discretion, but plaintiff's counts alleging conversion and civil conspiracy were properly dismissed. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 07-CH-1886; the Hon. Thomas E. Mueller and the Hon. Michael J. Colwell, Judges, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded with directions. |
| Counsel on Appeal | Michael Resis, of SmithAmundsen LLC, of Chicago, and Ellen L. Green, of SmithAmundsen LLC, of St. Charles, for appellants. |
| | Nancy G. Lischer, of Hinshaw & Culbertson LLP, of Chicago, Michael J. Denker, of Denker & Muscarello, LLC, of St. Charles, and John D. Eddy, of Eddy, DeLuca, Gravina & Townsend, of Pittsburgh, Pennsylvania, for appellee F. Gary Kovac. |
| | Stephen M. Cooper, Peter M. Storm, and Philip J. Piscopo, all of Cooper, Storm & Piscopo, of Geneva, for other appellees. |
| Panel | PRESIDING JUSTICE BURKE delivered the judgment of the court, with opinion.<br>Justices McLaren and Schostok concurred in the judgment and opinion. |

## OPINION

¶ 1 This appeal involves a dispute between plaintiff, F. Gary Kovac, a 50% shareholder of defendants Pinnacle Systems, Inc., Triad Controls, Inc., and Pressroom Electronics, Inc. (Operating Companies), and Kenneth L. Barron, Jr. (deceased), the other 50% shareholder. Kovac alleged that Barron had secretly arranged, through the use of a payroll servicing company (KES), wholly owned by Barron, to pay himself substantially more in salary despite an agreement that Kovac and Barron would take the same salaries and bonuses. Kovac further alleged that Barron formed Repair Services, Inc., a separate company wholly owned by him, and diverted the income from the Operating Companies' repair business to Repair Services without the knowledge or consent of the Operating Companies' boards of directors. The Operating Companies filed their own cross-complaint against Barron alleging mismanagement, excessive compensation, and the diversion of repair business income through Repair Services.

¶ 2 All defendants filed a motion to dismiss the conversion and conspiracy counts (counts IV, VII, VIII, IX, and X) alleged in Kovac's second amended complaint, pursuant to section

- 2 -

2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2008)). The trial court granted the motion. Barron's wife, Sandra, as independent administrator of Barron's estate, filed a motion to dismiss the cross-complaint pursuant to section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2008)). The trial court granted the motion and dismissed the cross-complaint pursuant to section 2-619(a)(3) of the Code (735 ILCS 5/2-619(a)(3) (West 2008)).

¶ 3    Following a bench trial, the trial court entered judgment in favor of Kovac as to count V (fraud), awarding him $3,220,702, and the court imposed a constructive trust on Barron's estate. The trial court further entered judgment in favor of Kovac as to count VI (breach of an oral agreement to lease property to the Operating Companies and share equally in the rental profits) and awarded Kovac $45,981. As to count II (breach of fiduciary duty to the Operating Companies and their shareholders by diverting repair business income from the Operating Companies to Repair Services), the trial court entered judgment in favor of the Operating Companies and awarded damages in the amount of $327,790. Finally, the court awarded Kovac $450,000 in punitive damages against the estate.

¶ 4    On reconsideration, the court entered judgment in favor of Kovac on count I (breach of fiduciary duty for mismanagement, pursuant to section 12.56 of the Illinois Business Corporation Act of 1983 (Business Corporation Act) (805 ILCS 5/12.56 (West 2008))), but it did not award additional damages as they would be duplicative of those awarded under count V. As to count II, the court found that the relief Kovac sought was on behalf of the Operating Companies and entered judgment in favor of the Operating Companies.

¶ 5    Sandra appeals, arguing that (1) the trial court's judgment on count V was against the manifest weight of the evidence; (2) the trial court's judgment on count I was against the manifest weight of the evidence; (3) Kovac could not assert counts II and V as direct claims in his individual capacity and they should have been brought as derivative claims on behalf of the Operating Companies; (4) the judgment on count II must be vacated since the Operating Companies had no action pending against Barron at the time of trial; and (5) the trial court erred in awarding punitive damages.

¶ 6    Kovac cross-appeals the dismissal of the conversion and conspiracy claims. The Operating Companies also cross-appeal the dismissal of their cross-complaint. We affirm in part, reverse in part, and remand the cause with directions.

¶ 7                                      I. FACTS
¶ 8                                    A. Pleadings
¶ 9    On September 12, 2007, Kovac sued Barron, the Operating Companies, and Repair Services. On November 6, 2007, Barron, the Operating Companies, and Repair Services filed a motion for leave to file a counterclaim against Kovac. Two days later, the trial court entered an agreed order in which it appears that the defendants abandoned the motion for leave to file a counterclaim.

¶ 10   On April 18, 2008, Kovac filed a first amended complaint and, on May 15, 2008, he filed a second amended complaint. The second amended complaint was brought against Barron, Sandra, the Operating Companies, and Repair Services. Specifically, count I, against Barron and the Operating Companies, alleged a violation of the Business Corporation Act and gross mismanagement of the business. Count II, against Barron, alleged that he had breached his

fiduciary duty to the Operating Companies and their shareholders by diverting repair business income from the Operating Companies to Repair Services. Count III, against Barron and Repair Services, alleged tortious interference with economic advantage in connection with the diversion of income. Count IV, against Barron, alleged that Barron misappropriated funds through KES. Count V, against Barron, alleged fraud for secretly paying himself and Sandra unauthorized and excessive salaries and bonuses. Count VI, against Barron, alleged breach of contract for his failure to pay Kovac half of the rental profits from their property.[1] Count VII, against Barron, alleged that Barron's refusal to pay Kovac those rental profits constituted conversion. Count VIII, against Sandra, alleged that Sandra's excessive compensation from KES for the bookkeeping services she performed for the Operating Companies constituted conversion. Both counts IX and X, against Barron and Sandra, alleged that they conspired to convert funds belonging to Kovac by transferring those funds from the Operating Companies to KES and by keeping 100% of the rental profits.

¶ 11      The defendants filed a motion to dismiss Kovac's second amended complaint, pursuant to section 2-615 of the Code, on several grounds, including that counts II through V, VIII, and IX could be brought only as derivative claims on behalf of the Operating Companies. Following a hearing, the trial court granted the defendants' motion to dismiss counts IV, VII, VIII, IX, and X with prejudice, which included all claims pleaded against Sandra individually. As a result, Sandra was dismissed as a defendant. The trial court later dismissed count III of the second amended complaint with prejudice and dismissed Repair Services as a defendant.

¶ 12      Barron was adjudicated a disabled person on November 19, 2008. Sandra, not individually, but solely as plenary guardian for the person and estate of Barron, was substituted as a party in place of Barron. On November 17, Sandra, as guardian, filed a counterclaim against Kovac for breach of fiduciary duty.

¶ 13      On April 30, 2009, the Operating Companies filed a cross-complaint against Sandra, as guardian, for Barron's alleged breaches of fiduciary duties arising out of the alleged gross mismanagement of the Operating Companies (count I), payment of excessive compensation and unauthorized distributions (count II), and engaging in a competing business and diverting repair business income from the Operating Companies (count III).

¶ 14      On June 29, 2009, Sandra filed a motion to dismiss the cross-complaint, pursuant to section 2-619.1 of the Code. Sandra argued that all of the cross-claims constituted the "same action" by the "same party" as in Kovac's complaint and were therefore barred under section 2-619(a)(3) of the Code. The Operating Companies argued that they were not the same parties, because Kovac was the shareholder while the Operating Companies were the corporations. Following a hearing, the trial court dismissed the Operating Companies' cross-complaint with prejudice pursuant to section 2-619(a)(3). The record does not contain a transcript from the hearing.

¶ 15      On February 29, 2012, Barron died. On March 21, 2012, the trial court granted Kovac leave to file a third amended complaint against Sandra, as administrator of the estate, and the Operating Companies. Kovac re-alleged counts I, II, V, and VI. In count I he further alleged that he suffered financial loss in his capacity as a 50% shareholder in the Operating

---

[1]The Operating Companies conduct most of their business at a St. Charles facility Barron and Kovac owned equally as tenants in common and leased to the Operating Companies.

Companies and sought compensation. In count II he sought judgment in the amount of $350,134, "plus interest, costs of suit, punitive damages, reasonable attorney's fees, and further orders that such amounts be returned to the Operating Companies." In count V, Kovac maintained that he and Barron had an oral agreement to receive equal annual compensation and profit distributions and that Barron's mischaracterization of excess compensation as for "contract labor" paid through KES was part of a scheme to convert funds belonging to Kovac. In count VI, Kovac alleged that he and Barron orally agreed to lease the property they co-owned to the Operating Companies and share equally in the rental profits. Kovac also specifically reserved for appeal counts IV (conversion against Barron), VII (conversion against Barron), VIII (conversion against Sandra, individually), IX (civil conspiracy against Barron and Sandra, individually), and X (civil conspiracy against Barron and Sandra, individually), which had been previously dismissed by the trial court with prejudice.

¶ 16                                B. Pretrial Proceedings

¶ 17    Sandra filed a motion to bar certain evidence under the Dead-Man's Act (735 ILCS 5/8-201 (West 2010)). Sandra also filed a supplemental memorandum addressing testimony from Barron's discovery deposition in which Barron stated that "apparently" he and Kovac had agreed that they would be paid the same amount in salary and bonuses. Sandra asserted that this did not qualify as an admission. The trial court ruled that the statement was an admission against interest that would be admissible at trial. Kovac subsequently filed a motion *in limine* to enter into evidence certain of Barron's deposition testimony, including the statement that he and Kovac "apparently" agreed to equal compensation. The trial court granted the motion.

¶ 18                                    C. Bench Trial

¶ 19    On April 30, 2012, the matter proceeded to a bench trial at which the following evidence was presented. Triad Controls was formed by Barron, Kovac, and Ron Cejer in 1980, when they began developing a design for a safety light curtain, a type of manufacturing safety device. The first sale occurred in 1981. At the time, Cejer was president, Kovac was in sales, and Barron was in manufacturing. Triad moved into a facility in 1984, and then into a larger facility in 1987, after it began hiring technical personnel. In 1986 or 1987, Kovac and Barron bought out Cejer, and Kovac and Barron each became a 50% owner in the company. Triad moved again in 1994 to the facility located in St. Charles.

¶ 20    The other two Operating Companies, Pinnacle Systems and Press Room Electronics, were established in 2001 and 2002, respectively, by Kovac and Barron, as equal owners. Each of the Operating Companies was set up as a subchapter S corporation. Each company was designed to run in a specific marketplace. Triad is in the metal fabrication industry. Press Room is in the metal stamping industry. Pinnacle manufactures other types of safety devices used in manufacturing. Each corporation had a board of directors composed of Kovac and Barron. Barron became president of Triad in 1986 and of Pinnacle and Press Room when they were formed, and he remained in those positions until March 2009. Kovac served as vice president. Kovac conducted marketing and branding operations in Pittsburgh, Pennsylvania, while Barron conducted manufacturing operations and order fulfillment in St.

Charles. Accounts receivable and payable, payroll, and bookkeeping were also handled in St. Charles.

¶ 21    Barron formed KES around 1985 to administer and pay payroll taxes and employment benefits for individuals in Illinois who provided labor and services to the Operating Companies. The actual paychecks were handled by ADP, an independent payroll company. KES did not generate any revenue; rather, the funds to administer the payroll for the Illinois employees came from the Operating Companies, which allegedly provided only those funds necessary. Sandra was employed by KES since its inception. Personnel in the Pittsburgh sales office, including Kovac, were paid initially through Triad and later through Pinnacle.

¶ 22    Kovac works with Darrin Kohn, the Operating Companies' production engineer in St. Charles, to develop new products requested by customers. Kovac is responsible for compliance with Occupational Safety and Health Administration and American National Standards Institute requirements, performing research, and creating design criteria. After machines undergo a risk assessment, the type of safety device is selected, and the design criteria and desired functions are specified. The order is then filled in St. Charles.

¶ 23    Kohn and Marilyn Jacobsen, the Operating Companies' office manager, testified that Barron worked only half days. Barron allegedly had not worked a full day since the 1980s, and he admitted in his deposition that he left work each day around noon.

¶ 24    Barron's primary responsibility consisted of data processing. Jacobsen explained that Barron typed orders and gave them to her to take to the back room, where the product would be made. Kovac presented Barron's deposition testimony regarding these matters, and Sandra did not object. Barron had testified that his duties included billing, handling payables, processing orders, evaluating personnel, and granting raises. Barron acknowledged that he typed orders into the computer "like a data processing clerk would do." Kovac opined that, given these duties, Barron did not provide any service that justified greater compensation than Kovac's.

¶ 25    Kovac testified that he had believed that he always received the same salary and bonus as Barron. Kovac sued Barron when he learned that he was not receiving equal compensation. At the time in question, the board of directors for each Operating Company consisted solely of Kovac and Barron, and the boards never authorized the payment of unequal compensation.

¶ 26    Kovac submitted Barron's deposition testimony regarding Barron's and Kovac's compensation, without objection, despite the trial court's ruling that objections were to be made at trial. Barron was asked whether he and Kovac agreed that they would be paid the same amount in salary, and Barron responded "apparently, yes." Barron was then asked about the past practice that he and Kovac received equal salaries and bonuses. Barron was asked: "You always pulled the same salary out, didn't you?" Barron answered "yes." When asked "if there was a bonus at the end of the year," and whether Barron and Kovac paid themselves equal bonuses, Barron responded "yes." Barron then was asked when this practice of equal compensation stopped, but he could not recall.

¶ 27    Sandra testified at trial regarding the compensation that Barron and Kovac received. First, she testified that they never received the same salary and bonus and that their compensation was not even "pretty close." She admitted that this differed from her deposition testimony, where she had stated that Kovac and Barron were paid about the same salary and bonus every

year. At trial, she eventually agreed that Kovac and Barron made "pretty much the same bonus every year."

¶ 28    Sandra, who had taken a single accounting class in high school, worked for the Operating Companies part-time, around six to eight hours a week. Her responsibilities included bookkeeping, check writing, and some purchasing. She also handled payroll for KES, which involved calculating the Illinois employees' hours and submitting both the Illinois and Pennsylvania payrolls to ADP. Sandra also recorded payments and moved funds from the Operating Companies to KES to cover payroll. She testified that she probably handled the bookkeeping of Repair Services. Between 1999 and 2007, Barron unilaterally set Sandra's annual salary for her part-time work. During those years, her annual salary ranged from $172,800 to $272,800.

¶ 29    Kovac expected that Sandra would be paid a reasonable salary for her part-time bookkeeping services. However, compensation was set "in a manner consistent with maximizing the 401k benefits" for both Sandra and Barron. The Operating Companies' boards never authorized compensation consistent with maximizing 401k benefits. Without objection, Barron's deposition testimony that he never told Kovac the amount that he caused the Operating Companies to pay himself and Sandra was read into the record.

¶ 30    Around 2007, Barron's relationship with Kovac began to deteriorate. Barron began telling the Operating Companies' customers to pay Repair Services rather than pay the Operating Companies for repair work. Barron told Kohn that invoices for repairs should be sent out under the Repair Services name. Without objection, Jacobsen testified that Barron directed that all payments for repairs were to be funneled to Repair Services. Barron told Jacobsen to send to the Operating Companies' customers a letter stating that all repair payments should be sent to Repair Services. The repairs were still performed by the Operating Companies' employees at the St. Charles facility. Without objection, Barron's deposition testimony that it was his unilateral decision to divert the Operating Companies' repair business income to Repair Services was read into the record. None of the Operating Companies' boards authorized Barron to funnel the repair business income to Repair Services.

¶ 31    Kovac first became aware of Barron's actions when a distributor faxed the letter that Jacobsen had sent to customers stating that all repair payments were to be sent to Repair Services. According to Repair Services' account information located on the Operating Companies' computers, there were 1,052 transactions performed by Repair Services totaling $327,791.

¶ 32    Employees noticed that Barron's attitude toward Kovac changed and that he refused to talk to Kovac when he called. Barron instructed Jacobsen that, if Kovac called, she was to tell him that Barron was not in the office. In his answer to the complaint, Barron admitted that he had instructed employees not to communicate with Kovac. He also instructed Kohn not to share with Kovac information from a database that Kohn had created to keep track of products. Barron also withheld product cost information from Kovac.

¶ 33    Around this time, the Operating Companies cut off Kovac's salary, which was either not paid or only partially paid during 2007 and 2008. Kovac attempted to reach out to Barron, but his efforts were futile. In August 2007, Barron faxed Kovac a note stating that, if he continued to call his home phone, he would call the police.

¶ 34    Kovac sued and sought a preliminary injunction because Barron had locked him out of the businesses and was transferring payments from the Operating Companies' repair business to Repair Services. He requested that the court prevent Barron from denying him access to the businesses' office and records and from destroying records and wasting corporate assets. The court granted the preliminary injunction on October 1, 2007.

¶ 35    Kovac returned to court seeking judicial relief when he learned that Barron had violated the October 1 order. On October 9, Barron had approximately 40 to 50 boxes of records destroyed and only some of the information could be retrieved. Kohn testified that, after the court order was entered, Barron ordered an employee, Oscar Martinez, to throw out boxes of records. At trial and without objection, Barron's deposition testimony that he instructed Martinez to put 15 years of business records, including invoices, bills, checks, bank statements, and other bank records into the trash was read into the record. Further, Barron had continued to divert repair business income to Repair Services. Barron had caused thousands of dollars in personal expenses to be paid by the Operating Companies, including chartering an airplane. Barron had refused to process orders and continued to tell employees not to talk to Kovac or they would be fired. Barron admitted that he changed the locks to the St. Charles facility at the end of October.

¶ 36    On November 8, 2007, Barron agreed to an order requiring him to strictly abide by the terms of the October 1 order. Barron also agreed to immediately provide Kovac access to the Operating Companies' premises, bank accounts, and records.

¶ 37    On February 28, 2008, at the hearing on the preliminary injunction and on a motion for a rule to show cause, the trial court appointed a custodian for the Operating Companies to verify invoices and sign checks, among other duties. The court again ordered Barron to allow Kovac access to personnel, records, and the office. However, Kovac still was not given full access to the records and he sought judicial relief a third time in October 2008. By then, Kovac learned that Barron had not worked since March 2008. Contrary to the court's orders, Sandra was still diverting the Operating Companies' repair business income to Repair Services. Kovac requested the court to remove Barron as director of the Operating Companies, to cease payment to Barron for services he was not providing, to enjoin the Barrons from operating Repair Services, and for other relief.

¶ 38    After Barron was adjudicated disabled on November 19, 2008, and Sandra was appointed his guardian, Sandra stated that Barron's net worth totaled $6.72 million. Barron was removed as director by court order on March 19, 2009. The trial court appointed a three-person board for each Operating Company, which included Kovac, Sandra, and Gerald Hodge, an attorney. Later, Barron's daughter, Rebecca Dobbs, an attorney, replaced Sandra as a director. The trial court also removed Sandra from any employment position with the Operating Companies. Sandra was ordered to immediately discontinue operating Repair Services and competing with the Operating Companies.

¶ 39    Kovac was not aware that Barron was charging personal expenses to the Operating Companies and reporting them as business expenses. Barron had testified at his deposition that he paid personal expenses with funds from the Operating Companies and did not tell Kovac that he was going to do so.

¶ 40    Due to the destruction of the business records, Kovac was able to only partially reconstruct the charges for personal expenses. Sandra objected on the basis that the best evidence was the actual documents. However, this was contrary to Barron's stipulation that

the "best evidence rule will not be asserted by either party as to any document which appears to be a true and correct copy of the original." The court permitted Barron's deposition testimony that, because he destroyed records, he was not able to reconstruct everything. However, the court did not award damages for Barron's personal expenses.

¶ 41    The Operating Companies paid rent, taxes, and insurance on the St. Charles property, and Barron and Kovac paid the mortgage and interest. The excess was to be distributed equally between Barron and Kovac, starting in 1994. In 2006 and 2007, Kovac did not receive his 50% of the rental profits, which totaled $45,982.[2]

¶ 42    Kovac's expert, Robert Kleeman, a certified public accountant, reviewed voluminous documents and prepared summaries of the data, which showed the aggregate income of the Barrons and Kovac from 1999 through 2007, their respective contributions into the profit sharing plan, and Barron's officer compensation from KES, and he included an overall analysis of the Barrons' and Kovac's distributions and compensation.

¶ 43    Kleeman testified that the Barrons were collectively paid $4,916,897 more than Kovac in total compensation from 1999 through 2007. The Barrons received $13,736 in health care payments, while Kovac received $4,008. The Barrons received $30,323 in employer contributions under the profit sharing plan compared to Kovac's $14,768. The Barrons were paid $10,457,483 in gross wages compared to Kovac's $5,645,000. The differences totaled $4,916,897, after accounting for Sandra's salary for her part-time bookkeeping services. Kleeman opined that Kovac should have received half of that amount.

¶ 44    Kleeman explained at trial that KES operated as a common paymaster to service the Operating Companies' Illinois payrolls. He noted that, typically, paymaster companies have equal revenue and expenses, so that no income or loss is reported. In this case, however, Kleeman observed that the Barrons caused large sums to be transferred from the Operating Companies to KES and then distributed to them. Kovac did not receive similar payments from KES. Kleeman stated that these funds should have been reported on the Operating Companies' tax returns as profits and equally distributed to the owners, not secretly transferred to KES and distributed to the Barrons. Rather, the funds that the Barrons' received from KES were disguised on the Operating Companies' tax returns, listed under the category of "contract labor." "Contract labor" is used where there is no employer/employee relationship. Kleeman opined that it was inappropriate to list the Barrons' salaries or bonuses as contract labor or costs of goods sold. Officers' compensation should have been included under a specific line item on the Operating Companies' tax returns, where it would have been visible to Kovac. Kleeman further observed that Sandra's "outrageously excessive" compensation should have been listed on line 8, entitled "Salary and Wages," of other employees. Instead, it was hidden from Kovac by Barron's misuse of KES. Barron diverted millions from the Operating Companies to KES and then to himself and Sandra. If these funds had not been diverted, they would have been distributed equally as the Operating Companies' profits to Kovac and Barron.

¶ 45    Kleeman further testified that Sandra's salary of $172,800 to $272,800 per year, or $415 to $656 per hour, was an "outrageously unreasonable" amount for six to eight hours of bookkeeping per week and given Sandra's lack of credentials. Even if Sandra were highly

---

[2]On appeal, Sandra does not challenge that Barron deliberately failed to pay Kovac his share of the rental profits.

trained and worked for an accounting firm, she would have earned an average of $60 per hour, or $25,000 per year. In estimating damages, Kleeman assumed that Sandra's salary should have been $25,000 per year.

¶ 46 Using the conservative 20-year treasury-bill rate, Kleeman stated that accrued prejudgment interest on Kovac's total loss was $874,742. Kleeman testified that the amount owed to Kovac as a result of the difference in compensation paid to the Barrons from 1999 through 2007, including interest, was $3,220,702.

¶ 47 Kleeman's opinion relied on the principal assumption that Kovac and Barron were to share equal compensation from 1999 forward. According to Kleeman, section 1366 of the Internal Revenue Code provides that, unless there is an arrangement to the contrary, allocation of profitability is *pro rata*. 26 U.S.C. § 1366 (2006). Kleeman admitted that the Barrons reported the money that they received from KES as wages on their personal tax returns. He had no opinion as to the appropriateness of the Barrons' or Kovac's compensation as reflected on their W-2 forms. Sandra did not present any expert testimony.

¶ 48                                    D. Trial Court's Ruling

¶ 49 On June 6, 2012, the trial court found for Kovac and against Barron on counts II (breach of fiduciary duty), V (fraud), and VI (breach of contract). On count II, the court specifically found that Barron intentionally diverted repair business income to Repair Services, and the court awarded $327,900 in damages. However, it awarded those damages to the Operating Companies. On count V, the court held that Barron breached the fiduciary duty he owed to Kovac when he "grossly overcompensated his own wife and when he began to disproportionately compensate himself as compared to [Kovac]." The court found that Sandra's testimony concerning Kovac's compensation lacked credibility. It awarded $3,220,702 to Kovac, imposing a constructive trust on Barron's estate. As to count VI, the court found that the parties were equal partners in the ownership of the real estate occupied by the Operating Companies, and it entered judgment in favor of Kovac in the amount of $45,981 for rental profits.

¶ 50 Finally, the court awarded Kovac $450,000 in punitive damages. The court found punitive damages appropriate because Barron's behavior shocked the conscience. The court stated that there was "no explanation offered that even remotely explain[ed] the behavior of the decedent toward his business partner of many years, or his total disregard for the import of a valid court order."

¶ 51                                    E. Posttrial Proceedings

¶ 52 On July 19, 2012, Sandra moved for posttrial relief pursuant to section 2-1203 of the Code (735 ILCS 5/2-1203 (West 2012)) on counts II and V, and for a judgment in her favor on count I (mismanagement of funds pursuant to section 12.56 of the Business Corporation Act), which had not been addressed in the trial court's order of June 6, 2012. Following a hearing, the trial court acknowledged that it had not ruled upon count I after trial, but stated that Kovac had proved that claim. The court entered judgment on count I in favor of Kovac but did not award additional damages, because it found that the damages would be duplicative to those awarded under count V. As to count II, the court found that the relief Kovac sought was on behalf of the Operating Companies and that "equity allows this Court

to enter that judgment granting [Kovac's] prayer for relief but entering the judgment in favor of the Operating Companies."

¶ 53    Sandra appeals the trial court's rulings in favor of Kovac on counts I, II, and V, and from the award of punitive damages. Kovac cross-appeals the dismissal of the claims for conversion and conspiracy set forth in the second amended complaint. The Operating Companies cross-appeal the trial court's dismissal of their cross-complaint alleging mismanagement, excessive compensation, and the diversion of business through Repair Services.

¶ 54                                    II. ANALYSIS
¶ 55                                  A. Sandra's Appeal
¶ 56                                      1. Fraud
¶ 57    We first address Sandra's contention that the trial court's ruling in Kovac's favor on count V for fraud was against the manifest weight of the evidence. Sandra's main contention is that the proof of Barron's purported oral agreement with Kovac–that they would receive equal compensation–consisted solely of Barron's "admission" during his deposition testimony, which Sandra maintains was not an unequivocal admission sufficient to support the trial court's award of damages.

¶ 58    A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent, or the finding is arbitrary, unreasonable, or not based on the evidence. *Martinez v. River Park Place, LLC*, 2012 IL App (1st) 111478, ¶ 14. Under this standard of review, an appellate court will not overturn the trial court's findings merely because it "might have reached a different conclusion had it been the trier of fact." (Internal quotation marks omitted.) *Id.*

¶ 59    Where the evidence conflicts, it is the role of the trial court to resolve that conflict. *Kirkpatrick v. Strosberg*, 385 Ill. App. 3d 119, 129 (2008). Trial courts view the demeanor of the witnesses and are in the best position to determine their credibility. *Bohne v. La Salle National Bank*, 399 Ill. App. 3d 485, 501 (2010). We will not substitute our judgment for the trial court's regarding the credibility of the witnesses, the weight to be given to the evidence, or the inferences to be drawn therefrom. *Thompson v. Buncik*, 2011 IL App (2d) 100589, ¶ 26.

¶ 60    Our district reviews a trial court's decision on judicial admissions under the abuse-of-discretion standard. See, *e.g.*, *Pfeifer v. Canyon Construction Co.*, 253 Ill. App. 3d 1017, 1020 (1993); *Lowe v. Kang*, 167 Ill. App. 3d 772, 776-77 (1988).[3] Binding judicial admissions can be made by attorneys or parties and include admissions made in open court, discovery answers, stipulations, and pleadings. *Dremco, Inc. v. Hartz Construction Co.*, 261

---

[3]Other districts apply a *de novo* standard of review. See *Crittenden v. Cook County Comm'n on Human Rights*, 2012 IL App (1st) 112437, ¶ 46 (citing cases). We note that the cases advocating for either standard of review agree on the same basic framework to apply in determining whether to deem a statement a judicial admission. Accordingly, a case applying the abuse-of-discretion standard still requires the statement to be "clear, unequivocal, and uniquely within the party's personal knowledge" (*Serrano v. Rotman*, 406 Ill. App. 3d 900, 907 (2011) (citing *Williams Nationalease, Ltd. v. Motter*, 271 Ill. App. 3d 594, 597 (1995))), and a case applying *de novo* review also looks at the context of the statement (*Herman v. Power Maintenance & Constructors, LLC*, 388 Ill. App. 3d 352, 361 (2009)).

Ill. App. 3d 531, 536 (1994). The trial court had the discretion to decide whether Barron made a judicial admission and whether to admit evidence of that admission. See *Pfeifer*, 253 Ill. App. 3d at 1020.

¶ 61    During the deposition, Barron was asked about one of the Operating Companies' 401k savings plan for 2004, which showed that the same amounts were paid to Barron and Kovac. Barron was asked by Kovac's attorney, John D. Eddy, why they were paid the same amounts. Eddy specifically asked: "Isn't that because you guys agreed that you would be paid the same amount in salary?" Barron answered, "Apparently, yes." Eddy then asked: "You always made the same amount, didn't you?" Barron answered: "It was the most I get off the retirement." Eddy asked again: "You always made the same salary, didn't you?" Barron answered: "According to this, yes." Then the following colloquy ensued:

"Q. For as long as you guys have been partners, for the longest time–

A. Yes.

Q. –you always pulled the same salary out, didn't you?

A. Yes.

Q. And if there was a bonus at the end of the year, you paid yourselves an equal bonus, didn't you?

A. Yes.

Q. Until when?

A. I don't recall."

¶ 62    Upon our review of the deposition testimony, it is clear that, contrary to Sandra's argument, these answers did not relate solely to the 401k savings plan for one of the Operating Companies. The answers concerned the historic practice of the partners being compensated equally. The reference to "always pulled the same salary" and "paid yourselves an equal bonus" established conclusively that the questions and answers were not limited to the savings plan but related to the partners' general practice of equal compensation. Barron's answers do not appear to have been uncertain or confused. When read in context, we concur with the trial court that Barron made an admission that he and Kovac agreed to equal salaries and bonuses. Moreover, given Barron's steps to conceal his compensation, the record supports the inference of an agreement to split compensation between the parties. Accordingly, we do not find that the trial court abused its discretion in holding that Barron's testimony was a judicial admission. Additionally, because the evidence supports an agreement to equal compensation, it supports Kleeman's opinions regarding Kovac's damages.

¶ 63    We note that count V alleged an action for constructive fraud based on breach of a fiduciary duty. Breach of fiduciary duty is constructive fraud. *Duffy v. Orlan Brook Condominium Owners' Ass'n*, 2012 IL App (1st) 113577, ¶¶ 32-33. Fiduciary duties arise as a matter of law, not contract. *Miller v. Harris*, 2013 IL App (2d) 120512, ¶ 19. A fiduciary must act with utmost good faith and loyalty and is prohibited from enhancing his personal interest at the expense of the company's interests. *Maercker Point Villas Condominium Ass'n v. Szymski*, 275 Ill. App. 3d 481, 484 (1995).

¶ 64    Constructive fraud is "anything calculated to deceive, including acts, omissions and concealments involving a breach of legal or equitable duty, trust or confidence resulting in damage to another." (Internal quotation marks omitted.) *Duffy*, 2012 IL App (1st) 113577,

¶ 33. The elements of constructive fraud are: (1) a fiduciary relationship; (2) a breach of the duties that are imposed as a matter of law because of that relationship; and (3) damages. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 69. Officers, directors, and employees owe a fiduciary duty to the corporate employer and its shareholders. *Cwikla v. Sheir*, 345 Ill. App. 3d 23, 32 (2003); *Stamp v. Touche Ross & Co.*, 263 Ill. App. 3d 1010, 1015 (1993).

¶ 65 Here, the evidence supports the trial court's finding that Barron committed constructive fraud. Barron owed a fiduciary duty both to Kovac as a shareholder and to the Operating Companies because he was an officer and a director. Barron breached his fiduciary duty because he acted in his own interest and not in the interests of the Operating Companies and Kovac when he caused the Operating Companies to pay him and Sandra millions in excessive compensation over the years. Barron then concealed his fraudulent actions, in part by disguising their payments as "contract labor" on the Operating Companies' tax returns.

¶ 66 2. Equal Compensation

¶ 67 Sandra next argues that the trial court erred in concluding that Kovac and Barron were "statutorily mandated" to receive equal salaries. We agree that this was inaccurate. In a subchapter S corporation, the 50% shareholders are entitled to share equally in the *profits* of the companies. See 26 U.S.C. § 1366(a) (2006). However, the evidence does show that, by drawing excessive compensation for himself and Sandra, Barron did not share the profits equally. The evidence further shows that Kovac and Barron agreed to draw equal salaries and bonuses, which did not occur. While the trial court might have misspoken, its ultimate decision was amply supported by the evidence.

¶ 68 3. Constructive Trust

¶ 69 Sandra next contends that the trial court erred in imposing a constructive trust as part of the judgment on count V for fraud. We disagree. A constructive trust has long been the appropriate remedy where, as here, there is a breach of fiduciary duty. *Forkin v. Cole*, 192 Ill. App. 3d 409, 427 (1989). The imposition of a constructive trust was appropriate for the breach of fiduciary duty here, to prevent unjust enrichment to the estate. See *Pekin Insurance Co. v. Precision Dose, Inc.*, 2012 IL App (2d) 110195, ¶ 71.

¶ 70 4. Mismanagement of Corporate Assets

¶ 71 Sandra next claims that the judgment in favor of Kovac on count I for mismanagement or misuse of corporate assets under section 12.56(a)(3) of the Business Corporation Act was against the manifest weight of the evidence. A violation under section 12.56(a)(3) occurs where a director has acted "in a manner that is illegal, oppressive or fraudulent with respect to the petitioning shareholder" (805 ILCS 5/12.56(a)(3) (West 2008)), and damages may be awarded (805 ILCS 5/12.56(b)(10) (West 2008)).

¶ 72 Among other allegations, Kovac alleged that Barron violated section 12.56(a)(3) by compensating himself and Sandra with payments in excess of the fair and reasonable value of the services they rendered. Sandra maintains that any judgment based on Barron's "allegedly excessive compensation was against the manifest weight of the evidence absent evidence as to the value of his services as president of the highly profitable Operating Companies."

¶ 73     At the hearing on Sandra's posttrial motion, the trial court ruled in favor of Kovac on count I, finding that the evidence supporting count V for fraud also supported count I and that there was "ample evidence" of excessive payments. We agree.

¶ 74     Several witnesses testified that Barron's primary responsibility was little more than data processing. He worked only in the mornings for about four hours per day. Yet, in 2005 alone, Barron's compensation was over $1.1 million. Kovac testified that none of Barron's duties warranted such compensation. The trial court could reasonably conclude that Barron's daily clerical tasks, performed on a part-time basis, did not merit the amount of his compensation, contrary to Sandra's claims. We further find that the trial court did not abuse its discretion in allowing Kovac to state his opinion that Barron's part-time work did not warrant his inflated salary. Kovac was a founder, a 50% owner, a director, and an officer of the Operating Companies and thus he had the knowledge and background to state his opinion.

¶ 75     As to Sandra, the evidence showed that she handled "purchasing, payroll and payables" for six to eight hours per week and that her earnings amounted to as much as $656 per hour. Sandra had a high school education and took only one course in accounting. Kleeman opined that, if Sandra had worked for an accounting firm and had been highly trained, which she was not, she at most would have made $25,000 per year, or $60 per hour. We note also that the Barrons never introduced evidence that their job duties warranted the compensation they received. Instead, the only reason offered for their exorbitant salaries was to maximize their 401k contributions. Accordingly, we cannot say that the trial court's findings were against the manifest weight of the evidence.

¶ 76                              5. Sandra's Section 2-615 Motion to Dismiss

¶ 77     Sandra next argues that the trial court erred in denying the section 2-615 motion to dismiss counts II (breach of fiduciary duty for diverting business income from the Operating Companies to Repair Services) and V (fraud) because those claims should have been brought as derivative claims on behalf of the Operating Companies. The trial court entered judgment on count V in favor of Kovac. The court also found that Kovac sought relief on count II on behalf of the Operating Companies and "equity allows this Court to enter that judgment granting [Kovac's] prayer for relief but entering the judgment in favor of the Operating Companies."

¶ 78     The question presented by a section 2-615 motion to dismiss is whether the allegations of the complaint, when viewed in the light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted. *Hough v. Kalousek*, 279 Ill. App. 3d 855, 862 (1996). Illinois is a fact-pleading jurisdiction that requires a plaintiff to file both a legally and a factually sufficient complaint. *Id*. at 863. When ruling on a section 2-615 motion to dismiss, the trial court must take all well-pleaded facts as true and disregard any legal and factual conclusions that are unsupported by allegations of fact. *Lake County Grading Co. of Libertyville, Inc. v. Advance Mechanical Contractors, Inc.*, 275 Ill. App. 3d 452, 456-57 (1995). The standard of review on a section 2-615 ruling is *de novo*. *T&S Signs, Inc. v. Village of Wadsworth*, 261 Ill. App. 3d 1080, 1083-84 (1994).

¶ 79     As to count V for fraud, Kovac, as a 50% shareholder, sustained an individual injury and could bring a claim on his own behalf for those damages. See *Zokoych v. Spalding*, 36 Ill.

- 14 -

App. 3d 654, 664 (1976) ("[s]ufficient facts of an ultimate and direct injury to plaintiff are set forth, and he may properly maintain the action in his own behalf").

¶ 80    As to count II for breach of fiduciary duty, Kovac sought relief for an injury to the corporations. He sought damages only for the Operating Companies. Sandra maintains that the trial court's award on count II should be vacated because the Operating Companies had no claims pending at the time of trial. Sandra asserts that, if we direct the judgment on count II to be entered in favor of Kovac, the award should be reduced by 50% since Kovac is a 50% shareholder.

¶ 81    We agree that count II should have been brought by the Operating Companies or by Kovac in a derivative action. A party does not acquire standing to maintain an action in his own right, as a shareholder, when the alleged injury is inflicted upon the corporation and the only injury to the shareholder is the indirect harm of the diminution in value of his corporate shares resulting from the impairment of corporate assets. *Hamilton v. Conley*, 356 Ill. App. 3d 1048, 1054 (2005).

¶ 82    The problem here is that the Operating Companies did make the same claim in count III of their cross-complaint (breach of fiduciary duty for engaging in competing business). The trial court granted Sandra's motion to dismiss that count and therefore the Operating Companies did not have a cause of action pending at the time of trial. However, the court ultimately awarded damages to the Operating Companies.

¶ 83    Kovac points out that, even if we determine that the claim is derivative and that only the Operating Companies may maintain the claim, we have the power to enter any order that should have been entered by the trial court, under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994). We agree and reverse the judgment of the trial court finding in favor of Kovac on count II. We also reverse the judgment of the trial court granting Sandra's motion to dismiss count III of the Operating Companies' cross-complaint. Finally, we enter judgment in favor of the Operating Companies on count III of their cross-complaint and order that the funds that Barron received from Repair Services for repair work be awarded to the Operating Companies on remand.

¶ 84                                6. Punitive Damages

¶ 85    Sandra last contends that punitive damages were improperly awarded to Kovac, claiming that punitive damages are not recoverable from a deceased tortfeasor's estate. The majority of jurisdictions do not allow for punitive damages after the tortfeasor's death. Sandra urges this court to adopt the view taken by the majority of jurisdictions and reject *Penberthy v. Price*, 281 Ill. App. 3d 16 (1996), the only case in Illinois where a claim for punitive damages survived the defendant's death. Kovac advocates following *Penberthy*. *Penberthy* was decided by the Appellate Court, Fifth District. Of course, we are not bound to abide by the holding of another district of the appellate court. See *Schramer v. Tiger Athletic Ass'n of Aurora*, 351 Ill. App. 3d 1016, 1020 (2004).

¶ 86    Punitive damages serve as punishment for the defendant and are designed to promote three rationales: (1) to act as retribution against the defendant; (2) to deter the defendant from committing similar wrongs in the future; and (3) to deter others from similar conduct. *Kochan v. Owens-Corning Fiberglass Corp.*, 242 Ill. App. 3d 781, 797 (1993).

¶ 87    The majority of cases from other jurisdictions focus on the first two rationales in holding that punitive damages abate upon a tortfeasor's death. See, *e.g.*, *In re Vajgrt*, 801 N.W.2d 570, 575-78 (Iowa 2011) (as tortfeasor's state of mind is important and he is no longer available to defend himself, punitive damages claims abate upon tortfeasor's death); *Crabtree v. Estate of Crabtree*, 837 N.E.2d 135, 137-40 (Ind. 2005) (punitive damages from driver's estate would not serve the purpose of punishing tortfeasor driver); *Mongold v. Estate of Gilbert*, 114 Ohio Misc. 2d 32, 35-36 (2000) (deterrent function of punitive damages is insufficient to support award when tortfeasor dies before trial).

¶ 88    *Penberthy* and other jurisdictions that have allowed punitive damages even when the wrongdoer has died tend to focus on the third rationale. See *Vajgrt*, 801 N.W.2d at 577 n.6; see also *Munson v. Raudonis*, 387 A.2d 1174, 1177 (N.H. 1978) (holding that, although New Hampshire law does not allow for punitive damages, compensatory damages survive the death of the tortfeasor and "compensatory damages awarded may reflect the aggravating circumstances" when wanton, malicious, or oppressive conduct is involved (internal quotation marks omitted)).

¶ 89    Justice Hecht, dissenting in *Vajgrt*, believed that the rationale supporting the rule against punishing the wrongdoer's heirs for his or her malicious conduct was gravely flawed. *Vajgrt*, 801 N.W.2d at 578 (Hecht, J., dissenting). He found no logical reason why courts should allow a punitive award against a defendant who survives a judgment but deny it where death occurs earlier. *Id.* He noted that beneficiaries of the estate of a tortfeasor have no right or entitlement to more than the tortfeasor would have if he or she had lived, or to more than the net of the tortfeasor's estate after payment of all legal obligations, including judgments against the estate for punitive damages. *Id.* at 579. Aside from the question of whether the purpose of punishment can be achieved through a punitive damages remedy against the estate of the tortfeasor who willfully and wantonly injured another, Justice Hecht believed that it would powerfully serve as a deterrent to other potential actors. *Id.* at 579-80.

¶ 90    In *Penberthy*, a motorist and a passenger sued an intoxicated driver's estate for injuries from a collision that killed the intoxicated driver. The plaintiffs were awarded compensatory damages as well as punitive damages. In affirming the award of punitive damages, the court relied in part on *Grunloh v. Effingham Equity, Inc.*, 174 Ill. App. 3d 508, 519 (1988), wherein the court stated:

> "The factors generally considered in determining whether an action for punitive damages survives are: (1) whether under ordinary circumstances the requested punitive damages have a statutory basis or are an integral component of a regulatory scheme and the remedy available thereunder; and (2) whether strong equitable considerations favor survival of an action for punitive damages. Matters which are relevant in considering the second of the above factors include whether the defendant's alleged conduct offends against a strong and clearly articulated public policy; whether the underlying conduct constituted intentional misconduct, which is also a crime, instead of mere wilful and wanton conduct, which shades into simple negligence; and whether absent an award of punitive damages, a plaintiff who prevailed on the merits of his or her claim would at most be entitled to only a comparatively small recovery."

¶ 91    The *Penberthy* court found that the award of punitive damages did not have a statutory basis and was not an integral part of a regulatory scheme and remedy and that therefore the

first factor listed in *Grunloh* did not apply. The court, however, believed that the second factor did apply. *Penberthy*, 281 Ill. App. 3d at 21. Because driving under the influence of alcohol violated a strong and clearly articulated public policy, and because the underlying conduct was a crime, the court concluded that strong equitable considerations weighed in favor of survival of the claims for punitive damages. *Id.* at 22. The court found a sufficient deterrent purpose for punitive damages against a tortfeasor's estate even if the purpose of tortfeasor punishment is not achieved.

¶ 92   Here, Barron deliberately violated multiple, specific court orders to cease his misconduct, including diverting the Operating Companies' business income, destroying business records, and denying Kovac full access to the business. Additionally, Barron misappropriated millions of dollars from Kovac through fraud, deception, and the manipulation of his various businesses, which, as the trial court found, "shocked the conscience." Barron secretly used KES to funnel funds away from the Operating Companies and to pay blatantly outrageous amounts to himself and Sandra for their part-time work. He diverted business income from the Operating Companies to Repair Services. Furthermore, Barron took steps to conceal his fraudulent conduct when he destroyed business records and prevented employees from talking to Kovac. He ordered employees not to tell Kovac about the database of the Operating Companies' products and changed the locks to keep out Kovac.

¶ 93   Whether punitive damages should be awarded is reviewed using the abuse-of-discretion standard. *Levy v. Markal Sales Corp.*, 268 Ill. App. 3d 355, 378-79 (1994). In sum, Barron violated a strong and clearly articulated public policy by disobeying court orders, he defrauded his equal partner out of millions of dollars, and he diverted repair business income from the Operating Companies. We are not disposed to promulgate a sweeping rule of law that would permit punitive damages against deceased tortfeasor defendants in all circumstances. Given the cumulative effect of Barron's conduct in this case, however, we agree with the trial court that a judgment for punitive damages against Barron's estate powerfully serves as a deterrent to others. Accordingly, we cannot say that the trial court's determination to award punitive damages was an abuse of discretion.

¶ 94                                  B. Kovac's Cross-Appeal

¶ 95   Kovac contends in his cross-appeal that the trial court erred in dismissing counts IV, VII, VIII (conversion counts), IX, and X (civil conspiracy counts) under section 2-615 of the Code, because the facts alleged in his second amended complaint supported the claims against the Barrons. Kovac concedes that we need not address his cross-appeal as it relates to Barron if we affirm the underlying judgment, which we have. However, Kovac persists in his cross-appeal against Sandra as a joint tortfeasor.

¶ 96                                      1. Conversion

¶ 97   To prove conversion, a plaintiff must establish (1) that he or she has a right to the property; (2) that he or she has an absolute and unconditional right to the immediate possession of the property; (3) that he or she made a demand for possession; and (4) that the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property. *Cirrincione v. Johnson*, 184 Ill. 2d 109, 114 (1998). An action for the conversion of funds may not be maintained to satisfy a mere obligation to pay money.

*In re Thebus*, 108 Ill. 2d 255, 260 (1985). The subject of conversion is required to be an identifiable object of property of which the plaintiff was wrongfully deprived. Money may be the subject of conversion, but it must be capable of being described as a specific chattel, although it need not be specifically earmarked. It must be shown that the money "at all times belonged to the plaintiff and that the defendant converted it to his own use." *Id.* at 260-61.

¶ 98 Count VIII for conversion against Sandra alleged that: (1) Sandra was employed by KES to perform part-time bookkeeping services for the Operating Companies and, in exchange for her services, KES paid Sandra annual compensation; (2) the compensation far exceeded the reasonable value of the services she provided; (3) the payments to Sandra were not to compensate her for her services but were an integral part of Barron's scheme to misappropriate profits belonging in part to Kovac; (4) Sandra was a knowing participant and was fully aware that the excessive payments she received from KES consisted of funds that should have been equally distributed by the Operating Companies to Kovac and Barron; (5) by usurping Kovac's rightful distributions from the Operating Companies as aforesaid, Sandra unlawfully assumed dominion, control, and ownership of specific funds belonging to Kovac, in the principal amount of $580,900; (6) additional sums were similarly misappropriated by Sandra both prior to 2003 and subsequent to 2007; (7) "however, [Kovac] does not yet possess sufficient information to ascertain the amount thereof, and therefore makes such allegations upon information and belief"; and (8) despite demands made by Kovac for the payment of such sums, Sandra has failed and refused to pay said sums to Kovac.

¶ 99 In *Thebus*, the supreme court addressed whether an attorney had converted funds that he had withheld from his employees' paychecks for federal income taxes but failed to pay to the Internal Revenue Service. *Id.* at 257. The supreme court held that the conduct did not constitute conversion, noting that the attorney did not maintain a separate bank account in which the funds withheld were deposited and that the money owed to the IRS did not come into the attorney's hands from any outside source. It simply accrued with each pay period. *Id.* at 263.

¶ 100 Here, as in *Thebus*, the amounts allegedly due to Kovac from the overpayment of compensation to Sandra accrued over several years and were not specific and identifiable as funds belonging to Kovac. In count VIII, Kovac alleged that Sandra was paid excessive compensation by KES from 2003 through 2007 and that the excessive payments consisted of funds that should have been equally distributed by the Operating Companies to Kovac and Barron. To the extent that Kovac was entitled to a 50% share of these amounts, it was owed to him as a shareholder and payable as profits from the excess general operating funds of the Operating Companies. This claim for 50% of the Operating Companies' profits did not make the money specific and identifiable. The money had no characteristics distinguishing it from the rest of the operating funds of the Operating Companies.

¶ 101 Kovac argues that *Connelly v. Estate of Dooley*, 96 Ill. App. 3d 1077 (1981), supports his argument. In that case, the plaintiff alleged that he owned a 5% share of a law firm, with 85% and 10% owned by two other attorneys, respectively. In 1976, the latter two attorneys sold the assets of the law firm and each kept 90% and 10% respectively of the sale price. After the 85% shareholder died, the plaintiff sought from his estate the plaintiff's 5% share of the law firm's profits. The court held that the plaintiff stated a claim for conversion because the 1976 agreement to sell the law firm's assets evinced control inconsistent with the plaintiff's 5%

- 18 -

stock ownership and right of possession. *Id.* at 1082-83. Unlike in *Connelly*, there were no allegations that the Barrons exercised control over Kovac's ownership interests in the Operating Companies, such as by selling them to a third party. Kovac's share of the profits allegedly due accrued over time. He alleged no facts to show that he had an absolute and unconditional right to the immediate possession of his share of the Operating Companies' funds at all relevant times. Accordingly, we find that the trial court properly granted Sandra's motion to dismiss count VIII for conversion.

¶ 102                                    2. Conspiracy

¶ 103    To state a claim for civil conspiracy, the plaintiff must allege facts establishing: (1) an agreement to accomplish by concerted action either an unlawful purpose or a lawful purpose by unlawful means; (2) a tortious act committed in furtherance of that agreement; and (3) an injury caused by the defendant. *Merrilees v. Merrilees*, 2013 IL App (1st) 121897, ¶ 49.

¶ 104    With respect to Sandra, Kovac alleged in count IX that she was responsible for issuing checks and initiating transfers of funds from the Operating Companies to KES, that she was aware of Barron's scheme to misappropriate funds belonging to Kovac, and that "[a]t the direction of Ken Barron," caused the misappropriated funds to be transferred to KES and characterized as for "contract labor." In count X, Kovac alleged that Sandra was responsible for issuing checks from the Operating Companies for the payment of rent and that she caused 100% of the profits from that rent to be paid to Barron, "[a]t the direction of Ken Barron," with knowledge that certain of the profits were to properly go to Kovac.

¶ 105    It is well established that employees and officers of a corporation are the corporation's agents. See Restatement (Third) of Agency § 1.01 cmt. c, at 19 (2006) ("The elements of common-law agency are present in the relationships between employer and employee, corporation and officer ***."). Furthermore, the general rule is that there can be no conspiracy between a principal and an agent, because the acts of an agent are considered in law to be the acts of the principal. *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d 12, 24 (1998). An exception to this rule is where the interests of a separately incorporated agent diverge from the interests of the corporate principal, and the agent at the time of the conspiracy is acting beyond the scope of his authority or for his own benefit, rather than that of the principal. *Bilut v. Northwestern University*, 296 Ill. App. 3d 42, 49 (1998) (citing *Pink Supply Corp. v. Hiebert, Inc.*, 788 F.2d 1313, 1317 (8th Cir. 1986)). Another exception is where the agent is acting not as an agent but as a principal; in such a case, the agent can be liable for conspiring with the principal. *Id.* (citing *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430 (7th Cir. 1986)).

¶ 106    Kovac specifically alleged that Sandra was responsible for issuing checks, initiating transfers of funds from the Operating Companies to KES, and making rental payments at Barron's direction. Thus, Kovac clearly alleged that Sandra was acting as Barron's agent. Kovac did not allege that Sandra was acting as a principal or was separately incorporated. Since neither exception applies, Kovac's claims for civil conspiracy must fail, and the trial court properly dismissed counts IX and X.

¶ 107    Kovac cites *McFatridge v. Madigan*, 2013 IL 113676, arguing that evidence proving the factual basis for his conspiracy claims was presented at trial. *McFatridge* does not support that proposition; rather, it simply states that a cause of action should be dismissed only where

it is clearly apparent that the plaintiff can prove no set of facts that would entitle him to recover. *Id*. ¶ 16.

¶ 108 Moreover, in the trial court, Kovac did not seek leave to amend counts IX and X; instead, he asked the court only to deny the motion to dismiss. In such a case, the court limits its consideration of the questions raised to the confines of the pleadings as presented. *Board of Education of Cicero-Stickney Township High School v. City of Chicago*, 402 Ill. 291, 299 (1949). If during discovery or trial Kovac became aware of facts to support his conspiracy theories, it was incumbent upon him to allege these additional facts. He seeks leave to do so, as an alternative, for the first time in his reply brief. However, because he never sought such leave in the trial court, we find that it is too late to do so now. See *Criscione v. Sears, Roebuck & Co.*, 66 Ill. App. 3d 664, 670 (1978) (denying leave to amend dismissed claim on appeal where never requested in trial court).

¶ 109 C. Operating Companies' Cross-Appeal

¶ 110 The Operating Companies contend in their cross-appeal that the trial court abused its discretion in dismissing their cross-complaint pursuant to section 2-619(a)(3). A complaint may be dismissed under section 2-619(a)(3) when "there is another action pending between the same parties for the same cause." 735 ILCS 5/2-619(a)(3) (West 2008). When a motion is brought under section 2-619(a)(3) of the Code, as in this case, the trial court has discretion to decide whether dismissal is warranted. See *Workforce Solutions v. Urban Services of America, Inc.*, 2012 IL App (1st) 111410, ¶ 74. The purpose of a section 2-619(a)(3) motion is to avoid duplicative litigation. *Whittmanhart, Inc. v. CA, Inc.*, 402 Ill. App. 3d 848, 852 (2010).

¶ 111 The Operating Companies state that all of their cross-claims would merge with the judgment in Kovac's favor should we affirm the trial court. Because we have affirmed, we need not consider whether the trial court abused its discretion in dismissing the cross-complaint. We note, however, that based on our affirming the judgments on counts I and V of Kovac's complaint, counts I and II of the cross-complaint were properly dismissed under the same party-same action rule.

¶ 112 The Operating Companies further contend that the judgment on count I of Kovac's complaint should be amended to show "no additional damages," as opposed to "no damages," in order to conform to the findings and rulings of the trial court. We find this unnecessary. The trial court was clear that the damages awarded on count I would be the same as those awarded on count V. On reconsideration, the trial court upheld the damages on count V, as we do on appeal. The record is clear that no additional damages should be awarded on count I.

¶ 113 We reiterate here that we are reversing the dismissal of count III of the cross-complaint and remanding the cause to the trial court with orders to award the Operating Companies the damages entered on count II of Kovac's complaint.

¶ 114 III. CONCLUSION

¶ 115 Based on the preceding, we reverse the judgment in favor of Kovac on count II of his complaint; reverse the judgment granting Sandra's motion to dismiss count III of the Operating Companies' cross-complaint, and remand the cause for the trial court to award the

Operating Companies the funds that Barron received from Repair Services for repair work. In all other respects, we affirm the judgment of the circuit court of Kane County.

¶ 116    Affirmed in part and reversed in part; cause remanded with directions.