# Illinois Official Reports

## Appellate Court

---

### *People v. McKee*, 2017 IL App (3d) 140881

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BETHANY L. McKEE, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-14-0881 |
| Filed<br>Modified upon<br>denial of rehearing | May 9, 2017<br><br>June 15, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 13-CF-100; the Hon. Gerald R. Kinney, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Peter A. Carusona, and Byron S. Kohut, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>James Glasgow, State's Attorney, of Joliet (Patrick Delfino and Mark A. Austill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE McDADE delivered the judgment of the court, with opinion.<br>Justices Carter and Schmidt concurred in the judgment and opinion. |

¶ 1    The defendant, Bethany L. McKee, was convicted of two counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) following a bench trial and was sentenced to natural life imprisonment. On appeal, McKee raises an as-applied constitutional challenge to her sentence. We affirm.

¶ 2    FACTS

¶ 3    On April 25, 2013, the State charged McKee, Adam Landerman, Alisa Massaro, and Joshua Miner by superseding indictment with six counts of first degree murder in connection with the strangulation deaths of Eric Glover and Terrance Rankins.

¶ 4    The circuit court held a bench trial in August 2014 at which the evidence presented tended to establish the following facts.

¶ 5    On January 10, 2013, shortly before 4 p.m., McKee's father placed a call to the police to report two dead individuals in the residence occupied by Alisa Massaro and her father, Phillip. When the police responded, they first had contact with Massaro, who said there were two other individuals hiding in the house—Miner was hiding upstairs and Landerman was hiding downstairs. One officer found Miner upstairs where the two bodies were located; both bodies were facedown and showed signs of rigor mortis. One of the bodies was lying on top of black garbage bags that had been separated at the seams with its head wrapped in a plastic grocery bag. The head on the other body had been wrapped in a red plastic bag and was resting on a pillow. Miner told police that he had killed one of the men and Landerman had killed the other. Eventually, the police also discovered Landerman in the house.

¶ 6    McKee was not at the scene, but she was located driving her vehicle in Kankakee; she was stopped and taken into custody in connection with the murders. At the police station, when a detective told McKee that he wanted to speak with her, she said she wanted to talk, that she wanted to tell the truth, and that she wanted to know how much time she would get for being an accessory to murder. McKee was taken into an interview room, read her *Miranda* rights (which she waived), and interrogated. *Miranda v. Arizona*, 384 U.S. 436 (1966). A recording of the interrogation was introduced into evidence.

¶ 7    In January 2013, McKee and her 15-month-old daughter were staying in Massaro's residence in Joliet. Massaro occupied the second floor, while her father lived on the first floor.

¶ 8    On the night of January 9, 2013, Miner, who was Massaro's boyfriend, and Landerman were hanging out with McKee and Massaro at Massaro's residence. Short on money to buy alcohol and cigarettes, the group began discussing how to come up with some money. McKee had received a text from Rankins, who asked her if she wanted to drink alcohol with him and his friend, Glover. McKee mentioned to the group that Rankins always carried a large amount of cash, as he had two days earlier when she and Massaro had contacted him to buy them alcohol. Thereafter, the group began discussing a plot to rob Rankins.

¶ 9    Miner stated that he could beat up and kill Rankins and Glover and then steal their money. Landerman volunteered to help him. McKee indicated in her interview that she did not think anything was going to happen, but she also admitted that she went along with the plan.

¶ 10     McKee contacted Rankins, luring him and Glover to the residence. The group set up a signal to indicate when McKee and Massaro were to leave the room so Miner and Landerman could put the plan into action.

¶ 11     Rankins was with Glover when McKee contacted him. She led Rankins to believe that he and Glover were coming over to party with her and Massaro. When the two men arrived, the group began drinking and playing video games. After some time had passed, Miner gave the prearranged signal, so McKee picked up her daughter and left the upstairs apartment. Massaro also left.

¶ 12     McKee and Massaro went downstairs, where Massaro's father was sleeping on a couch. He was awakened by a loud noise coming from upstairs and was told that two men were moving a broken television. He threatened to call the police if the noise did not cease, and Massaro went to the door at the top of the stairs, saying she would tell the two men to be quiet. The door was locked, however, and Massaro heard Miner say "die, die."[1] The noise stopped shortly thereafter.

¶ 13     McKee and Massaro left to drop McKee's daughter at another residence. When they returned, Miner and Landerman were still there, and Rankins and Glover were lying stacked on the floor in one of the rooms. The bodies were later moved to the positions in which they were found by police.

¶ 14     McKee denied searching the bodies, but she acknowledged having been given some money by Miner, which she used for gas. She also searched Glover's vehicle and took several items, including compact discs, stuffed animals, and a pair of baby boots. The group left the residence and bought cigarettes and cocaine with the money taken from the Rankins and Glover. When they returned, they used the cocaine. They also kicked the bodies and hit them with an empty liquor bottle, although McKee said during her interrogation that she, at the insistence of Miner, kicked only one of the bodies one time. Also during that interrogation, McKee became upset when it was suggested to her that not all of the roughly $120 obtained from the robbery had been shared with her.

¶ 15     The next day, the group discussed what to do with the bodies. They talked of cutting them up and disposing of the parts, and Miner even brought over tools for that purpose. Miner also talked about cutting the face, with attached scalp, from one body and wearing it over his face—a suggestion which McKee admitted made the group laugh. McKee then proposed calling her father because he would know how to dispose of the bodies. The group agreed on that plan. McKee called her father, who said he would help her, but instead he called the police.

¶ 16     The circuit court announced its decision on August 29, 2014. Citing the common-design rule and numerous cases, the court analyzed the question of McKee's guilt on the basis of accountability. In part, the court found:

    "A review of [the] facts show a stunning lack of concern for the consequences of taking two human lives. The facts established at the trial indicate Ms. McKee played a key role in getting the victims over to the Massaro residence, knowing that the groups' intent was to commit the offense of robbery. She left the room when signaled

---

[1]Massaro testified at McKee's trial in exchange for the State dropping the first degree murder charges against her and her guilty plea to two counts of robbery and two counts of concealment of a homicidal death. Massaro was sentenced to a total of 10 years of imprisonment as a part of the plea deal.

so that the robbery could begin. She went downstairs and, when confronted by Phillip Massaro, lied to him regarding what was occurring in the upstairs apartment. She, along with Alisa Massaro, convinced Mr. Massaro to stay downstairs and not interrupt what was occurring on the second floor. After the victims were subdued, she participated in discussions with the other defendants and implicates herself in her statement that she felt that it was important that these bodies be removed from the premises by saying 'you got to get them out of here.' The money, that was the proceeds of the robbery, was used by this Defendant to obtain cigarettes and gas for her vehicle. She also participated in the drug use that occurred from the proceeds of the robbery. She assisted other individuals in helping place a Jewel bag over the head of Terrance Rankins and holding a lamp so that the bag could be placed on the victim's head. She clearly indicates in her statement that she knew there was going to be at the very least a fight and a robbery if Rankins came over. She also seemed upset in her interview when she realizes that there was probably more money stolen from these victims than she was told. She volunteered to search the vehicle of Eric Glover and removed from that vehicle stuffed animals, CDs, apparently for her use or her child's use."

The court also found:

"This Defendant had numerous opportunities to take steps to withdraw from the common criminal plan. She had her own vehicle at the residence, so she could have taken her child with her at any time and left. While texting Rankins, she could have taken steps to prevent him from even coming over to the house. When she was speaking with Phillip Massaro, she could have asked for his intervention to prevent the crime from occurring. When she left the residence to take her child away from the scene of the crime, she could have summoned the police. When she spoke to her father, she shows no discontinuation of her involvement with these individuals, but simply seeks his assistance to remove the bodies from the residence."

Accordingly, the court found that McKee was guilty by way of accountability of the first degree murders of Rankins and Glover.

¶ 17 On November 4, 2014, the circuit court held a sentencing hearing. Testimony at the hearing disclosed that McKee had been raped when she was 14 years old. The rapist also cut her face and chest with a knife over 200 times. In addition, McKee allegedly suffered from depression, bipolar disorder, attention-deficit/hyperactivity disorder, and post-traumatic stress disorder, and she had a history of cutting herself. She had been hospitalized nine times for her mental health issues—once for 89 days. She also had taken medication for her issues, but they were ineffective. In addition, McKee had transferred from a public high school to a therapeutic school to help her with her issues. Further, when McKee was still 14 but after the rape, she was missing for 14 days. When she was found, it was learned that, during those 14 days, she had been forced into prostitution, drugged, and beaten.

¶ 18 During arguments, defense counsel acknowledged that the statutory scheme mandated a natural life sentence for McKee, but he argued that the imposition of that sentence would violate the constitutional prohibition against cruel and unusual punishment.

¶ 19 At the close of the hearing, the court commented that it believed this case exemplified why the legislative imposition of *mandatory* sentencing was problematic. McKee only aided and abetted, yet she was subject to the same penalty as the actual murderers. The court noted

that it wished it had discretion to fashion a more appropriate sentence for McKee, but because the legislature had removed that discretion, it was compelled to sentence her to natural life imprisonment on her two first degree murder convictions.

¶ 20 McKee filed a motion to reconsider sentence in which she argued that her sentence was unconstitutional because it was cruel and unusual, in violation of the eighth amendment, and because it violated the proportionate penalties clause of the Illinois Constitution. Regarding the latter argument, McKee pointed out that one of her codefendants, Massaro, received only 10 years of prison time on two convictions for robbery and two convictions for concealment of a homicidal death. The court denied the motion, and McKee appealed.

¶ 21 ANALYSIS

¶ 22 On appeal, McKee argues that her natural life sentence is unconstitutional as applied to her particular circumstance. She does not challenge the validity of her two first degree murder convictions or the fact that section 5-8-1(a)(1)(c)(ii) mandates a natural life sentence for first degree murder involving more than one victim. 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2012). Rather, she claims that her natural life sentence both constitutes cruel and unusual punishment under the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) and violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11).

¶ 23 The Illinois Supreme Court has held that section 5-8-1(a)(1)(c)(ii) can be constitutionally applied to adult accomplices. *People v. Miller*, 202 Ill. 2d 328, 337 (2002). *Miller* also held that, while there is not a blanket dispensation from the mandatory sentence for juveniles, the statute is vulnerable to a properly supported, as-applied constitutional challenge by a juvenile. *Id.* at 341. More recently, the First District found an as-applied constitutional challenge to the statute valid where, given the particular facts of the case, the mandatory natural life sentence of a 19-year-old adult shocked the conscience of the community. *People v. House*, 2015 IL App (1st) 110580, ¶ 101. It is the challenging party's burden to establish the constitutional invalidity of a statute. *Miller*, 202 Ill. 2d at 335. "[A]n as-applied challenge requires a showing that the statute violates the constitution as it applies to the facts and circumstances of the challenging party." *People v. Thompson*, 2015 IL 118151, ¶ 36. Further, the constitutionality of a statute presents a question of law that we review *de novo*. *Miller*, 202 Ill. 2d at 335.

¶ 24 In the instant case, McKee, who was 18 and an adult at the time of the crime, asks that we follow the First District's decision in *House* and find the statute unconstitutional as applied to her and vacate her sentence of mandatory natural life.

¶ 25 The eighth amendment to the United States Constitution prohibits cruel and unusual punishments. U.S. Const., amend. VIII.[2] Cruel and unusual punishments include those that are "disproportionate to the crime." *Graham v. Florida*, 560 U.S. 48, 59 (2010). The proportionate penalties clause of the Illinois Constitution is coextensive with the federal Constitution's eighth amendment and states that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11; *In re Rodney H.*, 223 Ill. 2d 510, 518 (2006).

_____

[2]The eighth amendment is applicable to the states via the fourteenth amendment. U.S. Const., amend. XIV; *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008).

One of the forms of proportionality review that exists in Illinois states that "[a] statute may be deemed unconstitutionally disproportionate if *** the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *Miller*, 202 Ill. 2d at 338.

¶ 26    McKee cites to *Miller* and *House* in support of her argument. In *Miller*, our supreme court held that section 5-8-1(a)(1)(c)(ii) was unconstitutional as applied to the juvenile defendant. *Miller*, 202 Ill. 2d at 341. The court ruled that a natural life sentence in that case "grossly distort[ed] the factual realties of the case and [did] not accurately represent defendant's personal culpability such that it shock[ed] the moral sense of the community." *Id.* at 341. The court described those factual realities as "a 15-year-old with one minute to contemplate his decision to participate in the incident and stood as a lookout during the shooting, but never handled a gun," which resulted in the juvenile receiving the same sentence as the actual shooter. *Id.*

¶ 27    The instant case is readily distinguishable from *Miller*. The *Miller* court stated that even a juvenile accomplice could be sentenced to natural life imprisonment. *Id.* While McKee was only 18 at the time of the murders, she was nonetheless an adult, unlike the juvenile defendant in *Miller*. In addition, McKee did not join in the crime at the last minute or play only a peripheral role, such as a lookout like Miller. Rather, she actively participated in the planning of the robbery. She made the initial suggestion to rob Rankins; she lured Rankins and Glover to Massaro's residence; she helped conceal what was happening from Massaro's father; she stole items from Glover's car after he was dead; she accepted proceeds from the robbery and later complained because she might not have gotten her fair share; she participated in insults, although possibly unwillingly, to the bodies of the victims; and she sought the help of her father in disposing of the bodies. Under these circumstances, *Miller* is of no avail to McKee.

¶ 28    In *House*, the 19-year-old defendant was present and armed at the time the victims were forced into a vehicle at gunpoint, and he also served as a lookout at the time the victims were shot. *House*, 2015 IL App (1st) 110580, ¶ 84. The First District found that the defendant's young age was an important factor to consider, and the court cited to scientific research that indicated the young adult brain did not fully develop until the mid-20s. *Id.* ¶¶ 89, 95. The court also noted that the defendant did not aid in the planning of the crime (*id.* ¶ 89), had no criminal history of violent crimes, never knew his father (and his mother died when he was 18), was raised by his maternal grandmother, and did not graduate from high school (*id.* ¶ 101). Thus, the First District concluded that the defendant's sentence shocked the moral sense of the community and was unconstitutional as applied to him. *Id.*

¶ 29    While some similarities exist between the involvement of McKee and the defendant in *House*, the differences are significant enough that we do not believe the same result is warranted in this case. McKee actively participated in the planning of the crimes; she was not just complicit, she was an instigator. While it is true that she did not personally participate in the murders, it must be noted that she was aware that murder was at least a possibility and an intended consequence of their plan. During the planning of the crimes, Miner stated that he could kill Rankins and Glover, and Landerman stated that he could help. Then, the group decided on a signal that, when given, indicated to McKee and Massaro that they were to leave the room so the two men could carry out their part. Further, after the robbery and murders were committed, McKee took part in the distribution of the proceeds and the

- 6 -

discussion of options for dismembering and disposing of the bodies, as previously described. It was only due to the intervention of McKee's father that actual disposal of the bodies was thwarted. In sum, McKee's factual culpability for these crimes was much greater than that of House.

¶ 30   McKee also claims that we should follow the First District's decision in *People v. Harris*, 2016 IL App (1st) 141744, *appeal allowed*, No. 121932 (Ill. May 24, 2017), and hold that McKee's sentence is unconstitutional as applied.

¶ 31   In *Harris*, the 18-year-old defendant shot two individuals at a gas station, and one of the individuals died. *Id.* ¶¶ 5-6, 14. The defendant was convicted of first degree murder and attempted first degree murder and was sentenced to an aggregate prison term of 76 years. *Id.* ¶ 1. The defendant raised an as-applied constitutional challenge to his sentence, alleging that it was tantamount to a life sentence and therefore violated, *inter alia*, the proportionate penalties clause of the Illinois Constitution. *Id.* ¶¶ 31-32. The *Harris* majority agreed and held that "we believe that it shocks the moral sense of the community to send this young adult to prison for the remainder of his life, with no chance to rehabilitate himself into a useful member of society." *Id.* ¶ 69. In so ruling, the *Harris* majority emphasized that the defendant was young and had no criminal background, and it speculated that because he grew up in a stable home and finished his GED while in pretrial custody, he might be able to rehabilitate himself if given the chance. *Id.* ¶ 64. Furthermore, like the court in *House* and like McKee in our case, the defendant alluded to scientific research on brain development, which the *Harris* majority found persuasive:

> "The Illinois Supreme Court had recognized that research on juvenile maturity and brain development might also apply to young adults. The 19-year-old defendant in *People v. Thompson* argued, for the first time on appeal, that *Miller* should apply with equal force to him. 2015 IL 118151, ¶¶ 18-21. The Illinois Supreme Court noted that in as-applied challenges, 'it is paramount that the record be sufficiently developed' and that Thompson's record failed to contain any information regarding how the ' "evolving science" on juvenile maturity and brain development' should apply to the circumstances in the case. *Id.* ¶ 38. Though the Illinois Supreme Court did not extend *Miller* to young adults in *Thompson*, it did open the door for that argument.
>
> Unlike the dissent, we believe that the record contains sufficient facts to consider *Miller*'s applicability. We cannot extend *Miller*'s holding directly, but find that its analysis applies with equal force under the Illinois Constitution to a 19-year-old like Harris." *Id.* ¶¶ 61-62.

¶ 32   Justice Mary Anne Mason dissented from the *Harris* majority's ruling that the defendant's sentence violated the proportionate penalties clause of the Illinois Constitution. *Id.* ¶ 78 (Mason, J., concurring in part and dissenting in part). Justice Mason argued, *inter alia*, that the record was insufficient to decide whether the science on juvenile maturity and brain development impacted the defendant's case because he did not introduce evidence in the circuit court that this science applied to him. *Id.* ¶ 79.

¶ 33   In addressing McKee's *Harris*-based argument, we note initially that we are not bound by the decisions of other districts of the appellate court. See, *e.g.*, *Kovac v. Barron*, 2014 IL App (2d) 121100, ¶ 85. We also note that another panel of the First District refused to follow *Harris* due to its alleged misinterpretation of *Thompson*. *People v. Thomas*, 2017 IL App

(1st) 142557, ¶¶ 38-43. The *Thomas* majority stated that, contrary to the *Harris* majority's claim, "[t]he supreme court in *Thompson* did not 'open the door' for defendants to argue that the reasoning in *Miller* should be extended to young adults over the age of 18" because the ruling in *Thompson* was based on forfeiture. *Id.* ¶ 43 (citing *Thompson*, 2015 IL 118151, ¶ 39, for its ruling that the defendant had forfeited his as-applied constitutional challenge because he raised it for the first time on appeal).

¶ 34    Even if *Harris* was correctly decided, the instant case is factually distinguishable. The majority in *Harris* believed that the record contained sufficient facts to consider *Miller*'s applicability. *Harris*, 2016 IL App (1st) 141744, ¶ 62. The same cannot be said for this case. In this regard, we find the following commentary in *Thompson*—on the nature of the defendant's as-applied challenge to the extent that it sought support in scientific research on juvenile development—to be particularly relevant:

> "To support his as-applied challenge, defendant relies exclusively on the 'evolving science' on juvenile maturity and brain development that formed the basis of the *Miller* decision to ban mandatory natural life sentences for minors. Defendant maintains that this science applies with 'equal force' to a criminal defendant who was between the ages of 18 and 21 when the underlying crime was committed. The record here, however, contains nothing about how that science applies to the circumstances of defendant's case, the key showing for an as-applied constitutional challenge. Nor does the record contain any factual development on the issue of whether the rationale of *Miller* should be extended beyond minors under the age of 18. Undoubtedly, the trial court is the most appropriate tribunal for the type of factual development necessary to adequately address defendant's as-applied challenge in this case." *Thompson*, 2015 IL 118151, ¶ 38.

Here, McKee offered no evidence in the circuit court on the science of juvenile development or how it applied to her. Accordingly, *Harris* is of no avail to McKee, and we reject her request to follow it.

¶ 35    We acknowledge that McKee's personal history includes significant mental health issues and at least two extended and extremely tragic and traumatizing experiences as a 14-year-old. These experiences may well have arrested her maturation and exacerbated her mental health issues. We are also aware, as was the First District when it decided *House*, that research shows the 18-year-old brain, even without trauma, is not fully mature. We appreciate the trial court's frustration at being forced by section 5-8-1(a)(1)(c)(ii) to impose what it believed, given all of the circumstances, to be an unjustifiably harsh sentence.

¶ 36    The legislature has, however, evidenced its intent to bar consideration of those factors by withholding all discretion from the courts to impose any sentence more lenient than natural life upon conviction of more than one first degree murder. The supreme court found in *Miller* that the statutory penalty is too harsh to impose on selected juveniles; that its imposition can, in some situations, shock the moral sense of the community. *Miller*, 202 Ill. 2d at 341. Where, as here, the wrongdoer is legally an adult, played a critical role in developing the criminal plan, and was actively complicit in the execution of the robbery that resulted in the deaths of two men, we do not see that McKee has met her burden of establishing that her natural life sentence would shock the moral conscience of the community and was, therefore, unconstitutional as applied. Nor, given the facts of this case, do we see ourselves as authorized to reduce on appeal a sentence the circuit court was statutorily compelled to

- 8 -

impose.

¶ 37                                    CONCLUSION
¶ 38           For the foregoing reasons, the judgment of the circuit court of Will County is affirmed.

¶ 39           Affirmed.