NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 200133-U

NO. 4-20-0133

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 2, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Respondent-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| MICHAEL SHEA CARLOS, | ) | No. 92CF1062 |
| Petitioner-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices Holder White[1] and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*: The record contains sufficient factual findings for appellate review of defendant's claim his sentence violates the proportionate penalties clause of the Illinois Constitution, and the sentence is upheld.

¶ 2    Defendant, Michael Shea Carlos, appeals the circuit court's denial of his April 2017 successive petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1(f) (West 2016)). On appeal, defendant asserts the dismissal is improper as his mandatory life sentence for offenses he committed at age 18, when he exhibited the same transient

---

[1] Justice Lisa Holder White participated in this appeal, but has since been appointed to the Illinois Supreme Court. Our supreme court has held that the departure of a judge prior to the filing date will not affect the validity of a decision so long as the remaining two judges concur. *Proctor v. Upjohn Co.,* 175 Ill. 2d 394, 396 (1997).

crime-producing features of youthful offenders protected from such punishment by *Miller v. Alabama*, 567 U.S. 460 (2012), violates the proportionate-penalties clause of the Illinois Constitution. Defendant asserts the trial court failed to make factual findings on whether defendant established he possessed or exhibited those features. We disagree and affirm.

¶ 3                                      I. BACKGROUND

¶ 4            In December 1992, defendant was charged with the December 19, 1992, murders of Terry Williams and Jerome McDonald (720 ILCS 5/9-1 (West 1992)). Both victims were shot while in the parking lot outside Third Ward Club in Bloomington, Illinois. At the time of the shootings, defendant was 18 years old.

¶ 5                              A. Defendant's 1993 Trial

¶ 6            A jury trial was held on the charges. We need not summarize all evidence presented. Because defendant's postconviction claim relies, in part, on circumstances of the shootings, we summarize portions of the testimony.

¶ 7            Patricia Skinner, McDonald's ex-girlfriend, testified she and defendant were beginning to have a relationship. On the day of the shootings, Skinner was in her apartment eating and playing cards with defendant and others, including Jacalyn "Jackie" Samuels, Ricky Samuels, and Sandra Johnson. McDonald and his girlfriend, Shelly Pilant, stopped by Skinner's apartment. Defendant, McDonald, and Ricky went outside. When defendant returned to the apartment, he "was kind of upset with [Skinner] because of something that [McDonald] had told him." McDonald, Pilant, and Johnson left together. Johnson returned and told Jackie that Pilant said something about Jackie's son. This angered Jackie.

¶ 8            According to Skinner, defendant told her not to go to Third Ward Club that night. Skinner, however, decided to go. She paged defendant, telling him she was going to the club

with Johnson and Jackie. Jackie wanted to speak to Pilant. Defendant responded, saying he was going to Third Ward Club as well. When Skinner, Jackie, and Johnson entered the club, they saw Pilant and McDonald in the rear of the building near a pool table. Jackie and Pilant began to yell at each other. McDonald grabbed a pool cue and stepped between the two. Jackie also picked up a cue. After a bartender told them to leave, "[m]ore or less[,] the whole bar [went] outside."

¶ 9 In the parking lot, Skinner stood among "a lot of people." Williams, who was with his girlfriend, Kirchell Butcher, drove into the lot in McDonald's car. Jackie told Butcher she was going to break the car's windows. Williams entered the club and then returned with McDonald. A shouting match began between McDonald and Jackie. Williams was shouting, too. At some point, defendant started arguing with McDonald and Williams, telling them to leave Jackie alone. Defendant and McDonald "had words." Skinner saw defendant, who was 10 to 15 feet from her, pull out a gun. Someone attempted to wrestle it from defendant. Defendant then fired the gun. Williams fell. Skinner went to the ground at the same time. There, she saw McDonald on the ground.

¶ 10 Kirchell testified she was not only Williams's girlfriend but also McDonald's sister, defendant's cousin, and Jackie's cousin. On the night of the shooting, Kirchell went with Williams in McDonald's car to Third Ward Club to pick up McDonald and Pilant. After parking the car, Williams exited the vehicle. Jackie "got in his face saying something." She kicked the car. Williams walked toward the club. Kirchell stayed in the car. Kirchell observed defendant and Skinner walking toward Skinner's car. Defendant approached Williams and began arguing with him. Williams pointed his finger at defendant. Kirchell saw defendant pull a black gun from his waist and shoot Williams.

¶ 11 Clyde Butcher, who was McDonald's stepbrother, Kirchell's brother, and

defendant's cousin, testified he went with McDonald, Pilant, and another male to Third Ward Club on December 19, 1992. While sitting in his stepmother's van in the parking lot, Butcher saw Jackie and Skinner walking toward the club. Butcher saw McDonald exit the club. When McDonald was in the middle of the parking lot, Jackie and Skinner stopped him. The three were talking. Butcher heard McDonald curse and then saw McDonald walk away. Defendant was walking toward Third Ward Club. No one was around defendant. Defendant, who was standing near the van Butcher was sitting in, began shooting. It looked to Butcher like defendant was shooting at Jackie. Butcher could not see Williams. Butcher heard five gunshots.

¶ 12        Marion Carr, a cousin to defendant and McDonald, testified he went to Third Ward Club on December 19, 1992. That night, Carr stayed in the parking lot, sitting in a vehicle and drinking alcohol with two others. Carr testified he heard a gunshot but did not see a gun or anyone fire the gun.

¶ 13        Carr was then impeached by the State with statements he made to Jimmy "Spanky" Ledbetter, a paid police informant who secretly videotaped the conversation with Carr. Carr testified he told Ledbetter that defendant said "he was going to take care of business with McDonald" and Carr responded to defendant "[defendant] wasn't going to shoot [his] cousin." Carr further told Ledbetter he saw defendant shoot Williams and McDonald.

¶ 14        According to Carr, he lied to Ledbetter. Carr stated he thought he knew what happened "because [he] heard everything from the streets and trying to bring it to the meeting." The reason he lied to Ledbetter was "mainly to get the floor at the meeting" to "talk." After being asked if his lying had "anything to do with the idea that maybe security had been weak the night before" and if he was "trying to cover [himself] a little bit, make [himself] look good," Carr responded, "[y]eah, could have been." Carr testified his statements to the police and the

grand jury were the same as his testimony.

¶ 15    The State presented testimony of witnesses regarding the investigation into the crime and defendant's arrest. Defendant, with two others, was apprehended in Barbara Price's apartment during the early morning hours of December 20, 1992. He was found hiding under a bed.

¶ 16    In his defense, defendant called one witness to testify another individual called "Fat Cat" committed the murders. Defendant testified on his own behalf, denying he shot either McDonald or Williams.

¶ 17    Defendant was found guilty of both murders.

¶ 18                    B. Sentencing Hearing

¶ 19    At the beginning of the August 1993 sentencing hearing, the trial court concluded defendant, having been convicted of murdering two individuals, was eligible for the death penalty. Evidence presented established defendant had no prior convictions. However, evidence also established defendant sold Ledbetter cocaine multiple times in the months before the shooting, including a purchase of cocaine and a gun two days before the shootings. When defendant was arrested, he was found with $1000 in his possession. These funds included $140 from a transaction with Ledbetter. Ledbetter testified at the hearing he had gone to school with defendant and defendant's brother. Defendant and Ledbetter "were all in the same gang and we hung out sometimes."

¶ 20    Defendant presented the testimony of Alvin House, a clinical psychologist for the State of Illinois and an expert in standardized psychological evaluation. Dr. House performed a psychological assessment of defendant. They met four times. At the first two meetings, Dr. House interviewed defendant regarding his background, education, family, and life experiences.

Defendant attended Bloomington High School for almost four years but "was withdrawn" before graduation due to low attendance. Beginning in junior high, defendant had several part-time jobs in restaurants around town. Approximately a year before his arrest, defendant moved from his family home and resided in an apartment. Defendant had a son. Since his arrest, defendant was taking a class toward obtaining his general equivalency degree (GED) and had taken the test. Defendant was awaiting results at the time of his interview with Dr. House. Defendant "remained to some degree fixed on the future and the belief that he [had] a future and the hope that someday he will be free of the legal system." Defendant "showed some appreciation to the fact if he remained in the community [it was] highly likely he would continue to have problems." Defendant talked about moving north to live with relatives who had a stable life.

¶ 21        Dr. House opined defendant's "perceptions are normal." Defendant did not live in a fantasy but some of his judgments were objectively unrealistic. Defendant expected to be found not guilty. Dr. House stated defendant was "convinced that it would work so, there is some things in which his judgments can be questioned, but that does not mean he is out of contact with reality."

¶ 22        Defendant reported to Dr. House that he did well academically until high school, and his records were consistent with that. Defendant was able at times "to perform quite capab[ly] academically in challenging areas" and "probably could have done better overall if he applied himself." Defendant was the youngest of three children. Defendant's parents reported defendant, in elementary school, had a strong attachment to his family. He stuck up for his brother and stood "by them during times of family trials." Defendant's father, a minister, noticed a change in defendant during junior high school, when disciplinary concerns arose. "[T]ension and conflict" existed in school. During high school, defendant developed an interest in

automobiles. He had part-time jobs and shifted his time and effort to those interests, which affected school performance. Defendant "would work, get home, be tired and sleep in and either be late or miss early morning classes." Defendant's girlfriend became pregnant.

¶ 23		Dr. House performed interviews and tested defendant. During the four interviews, defendant seemed alert and fully orientated. Defendant's general intelligence fell in the low average range. He was in the ninth percentile. Defendant's verbal IQ was 80, and his performance IQ was 84. Dr. House opined something interfered with defendant's performance. Defendant "was making his best effort" but "sometimes he simply didn't sustain that." While he cooperated and was compliant, the testing was done in the jail's attorney room, which was noisy and had a wobbly table. All of which, including the fact defendant was on trial, impacted defendant's performance.

¶ 24		Dr. House found defendant had normal intelligence and no indication of mental retardation, learning disability, or neuro-, psychological, or cognitive impairment. There was also no evidence of a personality disorder, learning deficiency, or emotional behavioral disorder. There was no evidence of depression.

¶ 25		When asked regarding rehabilitative efforts, Dr. House observed defendant, who had been incarcerated for nine months at that time, studied for and obtained his GED. Defendant stayed out of trouble in jail and had no disciplinary actions against him. Defendant was a pod worker, carrying out some work assignments. Dr. House opined defendant would continue to try and make the best of it. Dr. House believed he would adjust to the setting as opposed to passively withdraw or act out in an impulsive and chaotic way.

¶ 26		Dr. House believed defendant had potential for rehabilitation, potentially doing some good while imprisoned. He did not know whether defendant could return to live in the

outside world. His assessment was prepared with the understanding defendant would be sentenced to death or to life imprisonment. Defendant recognized he was found guilty but continued to reject the premise of his guilt.

¶ 27    Defendant's father, Toby Carlos Jr., testified on defendant's behalf. He was a bus driver for a local school and an associate pastor. Toby testified defendant was "a gifted young man in spite of everything that ha[d] happened." Defendant "was a little more beyond his time," and he had great potential. Defendant was caring and helpful. Toby testified to defendant's faith and willingness to stand by his family and provide for his family. Toby talked about "peer pressure," stating defendant "wanted to have like every other young man have, he wanted a car." That is when defendant began working. Defendant, for his age, had a nice car with a "nice stereo."

¶ 28    Charlotte Carlos, defendant's mother, testified she believed a lot of the trouble in defendant's life "had to do with the peer pressure in school." She also called defendant caring and loving.

¶ 29    Kanya Dove testified she was defendant's fiancée and the mother of defendant's son, who was born in June 1992. She saw defendant almost every week. He would bring things for the baby. Since defendant was incarcerated, they continued to have a good relationship. Defendant called almost every day. Dove visited "at least twice a week." They wrote letters. Defendant also visited with his son at the jail on Sundays. In his letters, defendant told of plans, if he was released from prison, where they would move away "so his son won't have to grow up in the environment that he did." Defendant wanted to get his son "away from gangs and drugs and everything." Dove knew defendant was a member of the Gangster Disciples.

¶ 30    Defendant spoke to the trial court. Defendant told the court he "stepped down as a

member of the Black Gangster Disciples" since his incarceration. He apologized for what happened at Third Ward Club, but "on the advice of" counsel, he would not provide details.

¶ 31 The trial court observed the difficulty in determining who defendant was. The court noted it understood defendant's right not to speak to the matter but also noted it understood the State's characterization of defendant as nonremorseful and cold-blooded. The court did not know why the offenses occurred. The court theorized perhaps defendant was on cocaine or there was a territorial dispute or a dispute over the women and whom they were working for. The court believed it was a territory dispute or jealousy between defendant and McDonald. The court noted it could also have been due to the fact defendant was small in stature and perhaps was not given the respect to which he was entitled. The court emphasized the State's allusion to the fact defendant used this "as an opportunity to show people" they could not "mess around with" him and he was "just as tough as the next guy."

¶ 32 In addressing the aggravating factors, the trial court agreed the offenses were cold-blooded. The court observed even if defendant had something against McDonald, it did not "know why in the world [defendant] killed Terry Williams." The court emphasized defendant's drug activities and the fact he sold a gun. As for mitigating factors, the court stressed "the single biggest mitigating factor is that [defendant was] 19 years old." His whole life was ahead of him and he had family support.

¶ 33 The trial court observed, because there were two deaths in the case, it did not "have much room." The court's sentencing options were the death penalty or life imprisonment without parole. The court stated, "That is a decision for me because on the one hand if the Court finds you are likely to be rehabilitated I would like to see you have the opportunity to be out again, but I don't have that option. On the other hand, if I don't feel you are likely to be

rehabilitated[,] then we should put you to death." The court found, "I have decided primarily because of your age, the prior devotion to your family and some indication of desire to change, that these are mitigating factors sufficient to preclude the imposition of the death penalty, and I can only hope that time will [prove] me right." The court sentenced defendant to life imprisonment.

¶ 34                                C. Direct Appeal

¶ 35        Defendant appealed the conviction, arguing he was entitled to a new trial because the trial court impermissibly allowed into evidence a video that showed prior inconsistent statements by a defense witness. *People v. Carlos*, 275 Ill. App. 3d 80, 81, 655 N.E.2d 1182, 1182 (1995). We found no error and affirmed defendant's conviction. *Id.* at 84.

¶ 36              D. 2002 Petition for Relief From Judgment

¶ 37        In November 2002, defendant petitioned for relief from judgment under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2000)). Defendant alleged multiple errors, including his sentence violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The trial court dismissed the petition *sua sponte*, finding the petition untimely and frivolous and "totally lacking merit." Defendant appealed, arguing the trial court lacked authority to dismiss his section 2-1401 petition *sua sponte*. We disagreed and affirmed. *People v. Carlos*, No. 4-03-0037 (2004) (unpublished order under Illinois Supreme Court Rule 23).

¶ 38            E. 2007 *Pro Se* Petition for Postconviction Relief

¶ 39        In 2007, defendant filed a *pro se* postconviction petition under the Act (725 ILCS 5/122-1 *et seq.* (West 2006)), asserting the State knowingly presented perjured testimony. Appointed counsel filed an amended petition, adding a claim of actual innocence based upon newly discovered testimony and claims of ineffective assistance for failure to call two witnesses

to impeach Butcher's testimony and for failure to call a witness who did not see defendant with a gun during the shooting.

¶ 40       An evidentiary hearing was held. At this hearing, video evidence was admitted of a December 20, 1992, meeting of the Gangster Disciples after the shooting. A matter discussed was trying to find people to testify for defendant. The trial court denied defendant's petition. He appealed, arguing he had established actual innocence. This court affirmed. *People v. Carlos*, 2013 IL App (4th) 110389-U, ¶ 3.

¶ 41                              F. 2011 Motion for Ballistics Testing

¶ 42       In 2011, defendant filed, pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-3 (West 2010)), a motion for ballistics testing of the bullet recovered from McDonald's body. The trial court denied the motion. We affirmed, upon finding any results from such testing would not "significantly advance" a claim of actual innocence. *People v. Carlos*, 2013 IL App (4th) 120450-U, ¶¶ 14-15.

¶ 43                          G. Defendant's Successive Postconviction Petition

¶ 44       In April 2017, defendant moved for leave to file the successive postconviction petition, the petition at issue here. In his petition, defendant asserted his mandatory life sentence violated the proportionate-penalties clause of the Illinois constitution as it was contrary to the principles for sentencing of youthful offenders under *Miller*, 567 U.S. 460. Defendant argued although he was 18 at the time of his offense, the considerations of *Miller* should apply to the circumstances of his case.

¶ 45       The trial court granted defendant leave to file his petition and appointed counsel. Appointed counsel, in June 2018, filed an amended successive postconviction petition asserting the same claim. Ultimately, the court set the petition for an evidentiary hearing. In March 2019,

defendant moved for the appointment of expert, Laurence Steinberg, Ph.D., a professor of psychology at Temple University. According to the motion, Dr. Steinberg testified in more than 20 court hearings and depositions and would testify regarding the psychological and neurobiological immaturity of young adults. The court denied the motion.

¶ 46      At the July 2019 evidentiary hearing, both parties relied on documentary evidence. Defendant presented the 2017 testimony of Dr. Steinberg in *Cruz v. United States*, No. 11-CV-787, 2018 WL 1541898 (D. Conn. Mar. 29, 2018) on matters related to adolescent brain functioning. Dr. Steinberg testified he had expertise on adolescent psychology and served as the lead scientist for the American Psychological Association in drafting its *amicus* briefs in *Miller*, *Roper v. Simmons*, 543 U.S. 551 (2005), and *Graham v. Florida*, 560 U.S. 48 (2010). Dr. Steinberg defined the period of adolescence from age 10 until 21. Scientists who studied adolescence often divided the adolescent period into three phases: early adolescence, approximately ages 10 to 13; middle adolescence, ages 14 to 17; and late adolescence, ages 18 to 21.  Adolescents, when compared to adults, were more impulsive, more prone to engage in risky and reckless behavior, more driven by reward than punishment, more oriented toward the present than the future, and susceptible to the influence of others.

¶ 47      Dr. Steinberg testified the brain continued to develop throughout adolescence. Dr. Steinberg explained the brain was composed of various systems. When asked if there were systems of the brain that were particularly significant during adolescence, Dr. Steinberg began by discussing the "cognitive control system," which "is responsible for self-regulation as well as advanced thinking abilities." This system includes the prefrontal cortex and its connections to other brain areas. The prefrontal cortex is "mainly responsible for advanced thinking abilities like logical reasoning and planning ahead" and is "responsible for what psychologists refer to as

self-regulation, the ability to control our behavior and our thoughts and our emotions." The second system important during adolescence is the limbic system, "a deep structure of the brain." This system is important in how individuals process emotions and social information and experience reward and punishment.

¶ 48     When asked how the limbic system interacts with the prefrontal cortex, Dr. Steinberg explained the limbic system is thought of as the emotional center of the brain and the prefrontal cortex is the logical, rational center of the brain. Both of the systems were constantly active and could communicate with each other. In an emotionally arousing situation, the limbic system would be responsible for emotional arousal and the prefrontal cortex would be responsible for self-regulation. The "limbic system sometime[s] serves as an accelerator and the prefrontal cortex serves as the brakes." During adolescence, these systems do not communicate as well with each other as they do during adulthood. "[A]t the beginning of adolescence until age 17 or 18 or so, the limbic system becomes increasingly easily aroused." This occurs mainly because of puberty's impact on the brain and because "the prefrontal cortex develops very gradually over time so during middle and late adolescence, you have what we call a maturational imbalance between the systems because the limbic system is very easily aroused, but the prefrontal cortex, the cognitive control system is still immature, so very often arousal of the limbic system can overwhelm what the cognitive control system is capable of doing."

¶ 49     Dr. Steinberg was asked to describe the differences between hot cognition and cold cognition. Dr. Steinberg testified to the following:

> "When we're making decisions about things, sometimes we
> make them under situations that are very arousing, maybe we're
> angry or we're enthusiastic or we're with other people who arouse

- 13 -

our emotions, and we refer to that situation as the thinking in that situation as hot cognition. That can be contrasted with situations which are very calm when we're by ourselves. When we're not emotionally aroused and we refer to that as cold cognition."

Dr. Steinberg explained cold cognition relied primarily "on basic thinking abilities that are in place and are mature by the time we're 16 or so." In contrast, hot cognition relied on basic thinking abilities as well as "our capacity to regulate and control our emotions." "[T]he capacities necessary for good decision-making in hot situations or hot cognition are still immature during adolescence and aren't fully mature until the early or to the mid[-]twenties."

¶ 50 According to Dr. Steinberg, late adolescents "are more likely to take risks than people who are adults and more likely to take risks than young adolescents are ***." Dr. Steinberg explained a graph of risk-taking by age "would look like an upside-down U," peaking around ages 17 to 19. Impulse control continues to develop in the late adolescent years. A graph would show "a straight upward trending line that goes from age 10 to age 25 or so." Regarding peer pressure, Dr. Steinberg stated, "Susceptibility to peers is higher during late adolescence than it is in adulthood. It is slightly lower than it is during middle adolescence, but *** the ability to resist peer pressure is developing during the late adolescent years."

¶ 51 Dr. Steinberg stated if the question is "when is everything completed in all systems of brain both with respect to psychological functioning as well as brain development, I think the concessions would be that this is not the case until people are maybe 22 or 23 years old." This conclusion was based on psychological and brain-imaging studies. "Until the 1990s, it was assumed that the brain was fully developed by the time we were 10 or 11 years old," when the brain reaches its adult size. The advent of brain imaging technology allowed scientists to look

inside a living brain to see how the brain functions. The first published studies of how the brain changed during adolescence did not appear until around the year 2000. During the period "from 2000 into the middle or latter part of the decade, most of the research on adolescence brain development focused on people who were 18 and younger." According to Dr. Steinberg, "[t]here was *** virtually no research that went past that age and looked at brain development during late adolescence or young adulthood." Research began toward the end of that decade. Beginning around 2010, research began to accumulate on development in the brain beyond age 18.

¶ 52    When asked if there were ways in which the brains of 18- to 20-year-olds were similar to adults, Dr. Steinberg explained "with respect to behaviors that we might think of as cold cognitive driven so things like logical reasoning or the ability to solve problems under neutral nonarousing situations, people that age period perform just as well as adults do." That 18- to 20-year-old group was more similar to younger adolescents than to adults in that they continued to "show problems with impulse control and self-regulation and heightened sensation seeking which would make them in those respects more similar to somewhat younger people than to older people."

¶ 53    According to Dr. Steinberg, late adolescents were more likely to take risks than adults and young adolescents. Risky behavior was at its height in late adolescence. Impulse control continued to develop. "Susceptibility to peers is higher during late adolescence than it is in adulthood." The ability to resist peer pressure develops during the late adolescent years. Dr. Steinberg explained: "[T]he metaphor that I and other scientists use to describe this is having the accelerator pressed down without a good braking system in place. That would be true of mid adolescence as well as late adolescence." Dr. Steinberg wrote an article in 2003 entitled, "Less Guilty by Reason of Adolescence." Dr. Steinberg testified the central point of that article was

that adolescents were more impetuous than adults and were more susceptible to peer pressure and their personalities were less fully formed. The article was geared toward adolescents under the age of 18. If he were to write that article "today," he would apply the conclusions to the entire adolescent period. Late adolescents "possess many of the same traits" as the other adolescents. When asked if there was "any question today among the scientific community that late adolescence as a group possessed the same hallmark[ ] traits of youth that you ascribed to middle adolescence in 2003," Dr. Steinberg testified "[t]hey possess[ed] many of the same traits."

¶ 54    Dr. Steinberg further testified late adolescents, when with their peers and no adults present, are more inclined to take risks and they are more reward-seeking than when they are alone. Dr. Steinberg said the effect of peers on adolescents "is one of the main focuses of the research that my team at Temple University has been doing for the last 15 years." Dr. Steinberg stated, "What we have found *** is that when people are in the presence of their peers, up until about age 24 or so, we get this peer effect where it increases their risk-taking and reward-sensitivity, and we don't see that effect after age 24 where adults perform the same way when they are by themselves as when they are in a group." Dr. Steinberg observed "the vast majority of people that show immaturity during adolescence grow up to be mature adults, but we know that there are some immature adults so obviously not all of them do." Late adolescents know right from wrong but they are less able to control their own behavior.

¶ 55    Dr. Steinberg noted it was not possible using MRI studies to conclude any specific adolescent has attained psychological and neurobiological maturity. They were not yet at the capability of looking at an individual brain to ascertain whether the brain was more adolescent or adult. When hot cognition is involved, "adolescents are less likely to pay attention

to the downside of a risky decision, and they're more focused on the rewards of it, so it means that the prospect of being punished for something and I mean punishment not in a legal sense, like getting a shock in a psychological experiment, the prospect of being punished for something is less salient to an adolescent than it is to an adult."

¶ 56 The State asked the court to take judicial notice of defendant's sentencing hearing, a copy of Dr. House's written evaluation, a record of defendant's grades and discipline from Bloomington High School, and two statutory provisions related to youth sentencing, sections 5-4.5-110 (730 ILCS 5/5-4.5-110 (West Supp. 2019)) and 5-4.5-105 (730 ILCS 5/5-4.5-105 (West 2018)) of the Unified Code of Corrections. Dr. House testified to the bulk of his observations and conclusions at the sentencing hearing. Additional information included the fact defendant's older brother, two years older than defendant, was imprisoned at the time of the report. According to defendant's parents, defendant and his brother were close. His brother's problems were difficult for defendant. In addition, the report states defendant reported a suspension during his freshman year. It resulted from a fight that began between his older brother and another student. There were two or three suspensions in eighth grade but no other suspensions. Defendant was expelled from school a few weeks before high school graduation due to excessive absences. He attempted to return to high school the following fall but was given the option to attend an alternative education program to complete high school. Defendant declined.

¶ 57 In support of the petition, defense counsel argued the science, as established by the testimony of Dr. Steinberg, shows defendant was an adolescent when he committed the offenses. Defense counsel pointed to the evidence establishing teens, even one who is 18 years old, remain at a stage where the brain is not fully developed or functioning. Counsel focused on

hot cognition, emphasizing the following: "His accelerator or portion of his brain was on full speed. That portion of his brain is not fully developed and, therefore, cannot able to—not able to tell him to stop whenever he's in a situation that is emotionally charged such as the one we have here today." Defense counsel emphasized the evidence from the sentencing hearing showing defendant left his parents' house at age 17, and his parents noted he started acting differently. According to counsel, while defendant knew things he needed to do, his brain was not fully functioning, and defendant became involved with individuals who led him astray.

¶ 58    The State began by questioning whether defendant, if resentenced, could be sentenced to consecutive terms and by suggesting the trial court may only sentence defendant to a term of imprisonment where he would serve only 30 years with day-for-day credit. The State emphasized the question is whether the sentence is so wholly disproportionate as to the facts of the case so as to shock the moral conscience of the community. The State maintained the clearest and most reliable objective evidence of what contemporary values are in the legislation adopted by the legislators and Illinois legislation shows those over 18 should be treated as adults. The State further pointed to section 5-4.5-110 that provides for a parole system for those under 21 but excluded those sentenced to natural-life imprisonment and those sentenced under section 5-8-1 (730 ILCS 5/5-8-1 (West 2018)) for multiple murders. The State maintains a natural-life sentence of an adolescent does not, therefore, shock the conscience of the community. The State emphasized defendant was mature as he held a job since eighth grade and provided for his fiancé and child. The State further maintained there was no evidence of gang involvement in the murders or poor home environment.

¶ 59    In August 2019, the trial court denied defendant's successive petition. The trial court compared defendant's circumstances with those in the decisions of *People v. House*, 2015

IL App (1st) 110580, *vacated*, No. 122134 (Ill. Nov. 28, 2018) (supervisory order), *People v. Williams*, 2018 IL App (1st) 151373, *vacated*, No. 123694 (Ill. Nov. 28, 2018) (supervisory order), and *People v. McKee*, 2017 IL App (3d) 140881. In *House* and *Williams*, the First District found the life sentences imposed on the young adult defendants were unconstitutional. *House*, 2015 IL App (1st) 110580, ¶ 101; *Williams*, 2018 IL App (1st) 151373, ¶ 23. We note both decisions were later reversed and remanded for reconsideration under *People v. Harris*, 2018 IL 121932, ¶ 46, 120 N.E.3d 900, which found an as-applied challenge premature when there were no trial court "findings on the critical facts needed to determine whether *Miller* applies to defendant as an adult." In *McKee*, unlike in *House* and *Williams*, the Third District found the defendant, a 19-year-old at the time of the offenses, failed to establish her sentence was unconstitutional. *McKee*, 2017 IL App (3d) 140881, ¶ 36. The trial court noted it also considered the evidence as well as the trial court file. The court then held the following, rejecting defendant's claim:

> "In the present case[,] Petitioner was the shooter and the only person involved in the planning, preparation[,] and execution of the crime. He was not found guilty by way of accountability. He played the only active and critical role in carrying out the crime. There was no evidence presented at the Third Stage Hearing that Petitioner had any other role than this. Petitioner's culpability for the crimes were much greater than those of the Defendant [in] *House* and *Williams*. In fact, Petitioner's culpability was greater than that in *McKee* and the Court in *McKee* did not find mandatory life sentence unconstitutional as applied to that Defendant.

In the present case, Petitioner was a young adult whose cognitive abilities may not have reached full maturity. However, the evidence shows that Petitioner played a critical role in the carrying out of the crime as he was the shooter. Given the facts of this case[,] the Court finds Petitioner has failed to meet his burden of establishing that his mandatory natural[-]life sentence would shock the moral conscience of the community and is[,] therefore[,] unconstitutional as applied to him."

¶ 60    Defendant moved for reconsideration of the denial of his postconviction petition. The trial court held a hearing on defendant's motion. After the hearing, the trial court noted it considered the *Miller* factors in considering defendant's claims in his successive postconviction petition and addressed those by comparing the findings related to defendant to those related to the *McKee* defendant. The court noted petitioner was two months shy of turning 19, showing low-average intelligence but no mental deficits. The court emphasized defendant worked, supported his child, and bought a car. The court, when considering outside influence, noted in *McKee*, the defendant had two others telling her what to do but, in this case, "no outside influence[ ] *** were shown to be placed on" defendant. The court found "no evidence of gang involvement or other factors to which [defendant] could not extricate himself." The court found the rehabilitation factor weighed in defendant's favor. The court found defendant "articulate, educated[,] and pleasant," and he had family support at each hearing. The court noted the exhibits established defendant had "a strong probability for rehabilitation." The court had "little doubt [defendant had] the ability to be rehabilitated." Finding it duty bound to follow precedent, the court concluded the exact issues of *McKee* were present in this case and the *McKee* court

found no as-applied constitutional violation:

> "This Court is required and duty bound to follow precedent. In *McKee*, the exact issues were raised the Petitioner is now raising. The Court['s] interpretation is that three of the four *Miller* factors favored the Defendant more in *McKee* than the Petitioner in the present case and the Appellate Court found there was not an 'as applied' constitutional violation against cruel and unusual punishment. In both *McKee* and the present case, the trial judges expressed their disagreement and displeasure for having to impose the harshest of punishment of sentences to an 18[-]year[-]old individual, a mandatory life sentence. Yet, in *McKee*[,] the sentence was still upheld by the Appellate Court as not shocking the moral consciousness of the community and violating the Proportionate Penalties clause of the Illinois Constitution."

¶ 61    This appeal followed.

¶ 62                              II. ANALYSIS

¶ 63    Defendant argues the proportionate penalties clause of the Illinois Constitution requires he be afforded the same sentencing protections given to juvenile offenders under *Miller*, 567 U.S. 460. Defendant emphasizes he, age 18 at the time of the murders, exhibited the same transient crime-producing features of youthful offenders protected by *Miller*. Defendant further claims the trial court erred by not finding defendant proved he exhibited those features at the time of the offenses and by not ordering he be resentenced under *Miller*.

¶ 64    According to the proportionate penalties clause, criminal "penalties shall be

- 21 -

determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A sentence violates that clause if the sentence is "so wholly disproportionate to the offense committed as to shock the moral sense of the community." *People v. Brown*, 375 Ill. App. 3d 1116, 1118, 874 N.E.2d 607, 608-09 (2007). The question of whether a sentence shocks the community's moral sense may be made upon considering objective evidence and "the community's changing standard of moral decency." *People v. Moore*, 2020 IL App (4th) 190528, ¶ 31, 170 N.E.3d 204 (quoting *People v. Hernandez*, 382 Ill. App. 3d 726, 727, 888 N.E.2d 1200, 1202-03 (2008)).

¶ 65        Defendant's proportionate-penalties claim is an "as-applied constitutional challenge based on *Miller* [that rises] and [falls] with his assertion that a *Miller* analysis applied to him as a young adult offender." *People v. Cortez*, 2021 IL App (4th) 190158, ¶ 63, 185 N.E.3d 316. An as-applied challenge is different from a facial challenge. A facial challenge must show "the statute is unconstitutional under any possible set of facts." *Harris*, 2018 IL 121932, ¶ 38. In contrast, an as-applied challenge must establish "the statute is unconstitutional as it applies to the specific facts and circumstances of the challenging party." *Id.*

¶ 66        In *Miller*, our Supreme Court held mandatory life sentences without the possibility of parole for juvenile offenders, those under the age of 18, violate the eighth amendment's prohibition against cruel and unusual punishment. *Miller*, 567 U.S. at 489-90. In so holding, the *Miller* court examined its previous analyses from *Roper* and *Graham* and those decisions' reliance on "common sense" as well as "science and social science":

> "In *Roper*, we cited studies showing that ' "[o]nly a relatively
> small proportion of adolescents" ' who engage in illegal activity
> ' "develop entrenched patterns of problem behavior." ' *Id.*, at 570,

125 S. Ct. 1183 (quoting Steinberg & Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1014 (2003)). And in *Graham*, we noted that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds'—for example, in 'parts of the brain involved in behavior control.' 560 U.S., at 68, 130 S. Ct., at 2026. We reasoned that those findings— of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his ' "deficiencies will be reformed." ' *Ibid.* (quoting *Roper*, 543 U.S., at 570, 125 S. Ct. 1183)." *Miller*, 567 U.S. at 471-72.

The *Miller* Court stressed three ways children differ from adults for purposes of sentencing: (1) children are less mature and possess an underdeveloped sense of responsibility, (2) children are more vulnerable to negative influence and peer and familial pressure, and (3) because a child's character is less fixed, a child's conduct is less likely indicative of irretrievable depravity. *Id.* at 471. The Court concluded, while noting the harshest penalty may be appropriate, sentencing courts must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 479-80.

¶ 67    In support of his contention the *Miller* protections apply to him, defendant relies largely on the First District's decision in *People v. House*, 2019 IL App (1st) 110580-B, ¶¶ 46,

63-64, *rev'd in part, vacated in part*, 2021 IL 125124, ¶ 32. In *House*, the defendant was found guilty of two counts of first degree murder and two counts of aggravated kidnapping for the death of two men. *Id.* ¶ 4. Defendant's guilt was based on a theory of accountability, as he drove the two victims to the location of the shootings and some evidence established defendant acted as a lookout when the shootings occurred. See *id.* ¶¶ 13-14, 17, 32. Defendant was 19 years old at the time of the offenses. *Id.* ¶ 17.

¶ 68        The *House* court found the defendant's sentence violated the proportionate penalties clause of the Illinois Constitution. *Id.* ¶ 63. In so doing, the court cited articles that "illustrat[ed] the need to expand juvenile sentencing provisions for young adult offenders" and the articles' notes "that several European countries have already extended juvenile justice to include young adults." *Id.* ¶¶ 55-56. The court further pointed to recent Illinois legislation that supported its reasoning and followed "the recent trends *** that an individual under 21 years of age should receive consideration for their age and maturity level when receiving harsh sentences." *Id.* ¶ 62. The court vacated defendant's sentence and remanded for a new sentencing hearing to give him the opportunity to present evidence to show he did not deserve a mandatory sentence of natural life. *Id.* ¶ 65.

¶ 69        As the above citation shows, however, the First District's decision in *House*, after briefing was completed for this appeal, was vacated in part by the Illinois Supreme Court. See *House*, 2021 IL 125124, ¶ 44. The Illinois Supreme Court did not find *Miller* protections could not be extended to individuals under the age of 18 but found the case required further factual development. See *id.* ¶ 32; see also *People v. Masters*, 2021 IL App (4th) 210178-U, ¶ 19 (noting the *House* Court "reaffirmed the suggestion *** that a young adult defendant may raise an as-applied challenge pursuant to the proportionate penalties clause of the Illinois Constititution").

The court took issue with the First District's decision to distinguish *Harris*, 2018 IL 121932, due to the fact the defendant in *House* was found guilty under a theory of accountability while the *Harris* defendant was the principal offender. *House*, 2021 IL 125124, ¶ 30. The court emphasized *Harris* established a record for an as-applied constitutional claim is insufficient for appellate review when the claim was not raised before the trial court, an evidentiary hearing was not held, and no trial court findings of fact were made as to the defendant's specific circumstances. See *id.* ¶ 28 (citing *Harris*, 2018 IL 121932, ¶ 40). The *House* Court further observed the First District's decision was made based "on articles from a newspaper and an advocacy group" and "no trial court ha[d] made factual findings concerning the scientific research cited in the articles, the limits of that research, or the competing scientific research, let alone how that research applies to petitioner's characteristics and circumstances." *Id.* ¶ 29. The Illinois Supreme Court remanded for second-stage proceedings. *Id.* ¶ 32.

¶ 70        *House* reinforces the holding of *Harris* establishing the necessity for a sufficiently developed record, including factual findings, for appellate review of an as-applied constitutional claim. See *Harris*, 2018 IL 121932, ¶ 39. In *Harris*, the defendant asserted an as-applied constitutional challenge based on the contention *Miller* should apply to a defendant who was 18 years old at the time of the offenses. See *id.* ¶ 45. Because defendant's as-applied claim was not raised until his appeal of his conviction and sentence, the issue was not asserted before the trial court and there were no factual findings "on defendant's specific circumstances." *Id.* ¶¶ 16-17, 40. The court found defendant's as-applied claim was premature and suggested it "was not necessarily foreclosed *** in another proceeding." *Id.* ¶¶ 47-48.

¶ 71        Here, the record contains sufficient evidentiary findings on the critical facts necessary to decide whether *Miller* applies to defendant as a young adult. See *id.* ¶ 46. The trial

- 25 -

court's analysis was, in part, focused on *McKee*, and while *McKee* does not provide the best comparison, it still has relevance to this defendant's particular circumstances. The trial court expressly found it considered the *Miller* factors. We conclude the trial court did consider the evidence presented by defendant on brain development and did apply *Miller* to defendant's particular circumstances.

¶ 72        The scientific evidence regarding the brain development of late adolescents admitted here was more complete than often found in late adolescent sentencing cases. At the end of nine different factors discussed in the court's order denying defendant's motion to reconsider defendant's amended successive postconviction petition, the court specifically noted defendant's particular circumstances.

¶ 73        We note the General Assembly recently enacted legislation that allows parole review for persons under the age of 21 when the offense was committed (see Pub. Act 100-1182, § 5, eff. June 1, 2010); see also 730 ILCS 5/5-4.5-115 (eff. Jan. 1, 2020)), there is a question of whether that line, at least for purposes of sentencing in accordance with the proportionate penalties clause, is evolving. *Cf. Harris*, 2018 IL 121932, ¶ 60 (quoting *Roper* and stating "[n]ew research findings do not necessarily alter that traditional line between adults and juveniles"). Until the line evolves further and precedents are created, we conclude the trial court here did what it was supposed to do.

¶ 74                                III. CONCLUSION

¶ 75        Defendant's proportionate penalties claim was raised in the trial court, a third stage evidentiary hearing was held, the trial court made findings of fact regarding the application of *Miller* factors to defendant's specific circumstances. We thank the trial court for its thorough order denying reconsideration of the amended successive postconviction petition and affirm the

trial court's judgment.

¶ 76          Affirmed.